# United States Court of Appeals
## For the First Circuit

---

No. 06-2133

UNITED STATES OF AMERICA,

Appellee,

v.

EVANS ETRONS STROMAN,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

---

Before

Boudin, Chief Judge,

Selya, Senior Circuit Judge,

and Howard, Circuit Judge.

---

Tina Schneider, by appointment of the court, for appellant.
Margaret D. McGaughey, Appellate Chief, with whom Paula D. Silsby, United States Attorney, was on brief for appellee.

---

August 22, 2007

---

BOUDIN, Chief Judge. Evans Stroman appeals from his conviction for being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1) (2000), raising arguments under the Fourth and Fifth Amendments. The factual background is undisputed but some detail is needed to frame the issues.

Just after 5 a.m., on July 15, 2003, police in Lewiston, Maine, received a call informing them that two black men wearing t-shirts were attempting to break down the front door of an apartment building at 287 Bates Street, near the high-crime neighborhood of Kennedy Park. The caller indicated that one of the two men was named BJ, which the officers took as a reference to BJ Almeida, a repeat offender for whom an arrest warrant was outstanding.

At the scene, police found a single black man (later determined to be BJ's brother Jose Almeida) standing on the porch at 287 Bates Street, but he refused to answer their questions, indicating only that he was from Massachusetts. Officers who had prior experience with BJ Almeida confirmed that this was not BJ, and so the police split up to continue the search.

Knox Street runs parallel to Bates Street just one block over. There, about three hundred feet from the 287 Bates Street apartment building, Lt. Donald Mailhot saw a car with Massachusetts plates, oddly parked near the back stairway to another Bates Street apartment building. Stroman (who is black) and a woman were sitting in the back-seat of the car. At approximately the same

time as Mailhot left his police cruiser to approach the vehicle, a radio dispatch announced that another officer had BJ Almeida in custody.

As Mailhot approached the parked car, Stroman got out and began to walk in the opposite direction. He was told to stop, but did not. Mailhot then sought to restrain Stroman, who broke free and fled, leaving his leather coat in the officer's hands. Mailhot radioed the other officers with Stroman's description, and he was discovered shortly after, hiding on the fourth floor of a building on Knox Street.

Stroman was handcuffed and frisked, and after finding a knife the police arrested him. He was taken to a nearby jail, where a more complete search revealed crack cocaine inside his sweatshirt. Learning from Massachusetts police that Stroman was known to carry a gun, one of the officers then returned to the spot where Stroman had been found and discovered, inside a partially ajar ceiling tile directly above, a loaded handgun wrapped in a bandanna.

Because a fingerprint on the gun did not match Stroman's, Stroman was at the outset charged only with offenses related to the drugs and knife; but some five months later in a prison interview with agents Stroman confessed (after <u>Miranda</u> warnings) that he had been holding the gun for BJ Almeida. According to the confession, Stroman had traveled from Massachusetts with BJ, who had left the

car to confront his girlfriend living at 287 Bates Street over a personal matter.

Stroman was then charged in federal court with being a felon in possession of a firearm. He sought to suppress both the gun and the confession on fourth amendment grounds, arguing that both constitute fruits of a poisonous tree (the tree being his initial stop and attempted frisk by Mailhot outside the car). A magistrate judge recommended rejection of Stroman's suppression motion after an evidentiary hearing, and the district judge upheld that recommendation.

At trial, the prosecutor relied on Stroman's confession and on evidence of Mailhot's chase of Stroman and his arrest and the later discovery of the gun overhead. Testimony also showed that Jose Almeida had made urgent efforts to retrieve Stroman's coat from Mailhot after Stroman fled and that he had said to Stroman at the police station that the police were "lucky they didn't get 10" (the gun had a clip that carried ten bullets).

Stroman did not testify but offered a fingerprint expert confirming that the print on the gun was not his. In closing arguments, the prosecutor argued that Stroman's confession was reliable, pointing to various elements that were either affirmatively corroborated or "not contradicted." The defense objected, at least in part, to these "not contradicted" references

as violating Stroman's fifth amendment rights; but the judge rejected the claim.

After considerable deliberation, the jury convicted Stroman, who was sentenced to 35 months in prison. He now appeals, contesting the admission of his confession and gun and arguing that the prosecutor's "not contradicted" comments were improper. On review, raw factual determinations are tested for clear error and legal principles de novo, United States v. Coplin, 463 F.3d 96, 100 (1st Cir. 2006), cert. denied, 127 S. Ct. 1320 (2007), while law application issues sometimes but not always are reviewed with some but not automatic deference. Coady Corp. v. Toyota Motor Distribs., 361 F.3d 50, 57 (1st Cir. 2004).[1]

We start with Stroman's fourth amendment claim. Stroman's basic argument runs as follows: Mailhot lacked reasonable suspicion to stop and attempt to frisk him outside the car on the morning of his arrest. It was only as a result of that illegal stop that the gun was ultimately discovered, and similarly, the confession would never have been extracted in the absence of the allegedly unconstitutional frisk and subsequent arrest and imprisonment.

---

[1]Application issues--classing a unique set of facts under a general standard--are in formal terms legal rulings. Often a measure of deference is shown to the factfinder, partly on the ground that the rulings are often dependent on factual nuance, Jackson v. United States, 156 F.3d 230, 232-33 (1st Cir. 1998); but occasionally (for policy reasons of its own) the Supreme Court insists on de novo review as to a specific issue.

-5-

The government says that Stroman has no "standing" to object to the seizure of the gun, arguing that Stroman lacked any reasonable expectation of privacy in the gun--first, because he abandoned it, see Abel v. United States, 362 U.S. 217, 241 (1960), and second, because even if he did not abandon it, he left it in a common area of a shared residential building, see United States v. Brown, 169 F.3d 89, 92 (1st Cir. 1999).

This objection does not refer to Article III standing--which is clearly present--but essentially to the substantive question whether Stroman had a sufficient personal or privacy interest in the gun to trigger fourth amendment protection against its seizure. United States v. Kimball, 25 F.3d 1, 5 n.1 (1st Cir. 1994). But he is not relying on this kind of fourth amendment claim: his objection is to his allegedly illegal seizure, of which the gun and confession are arguably the fruits. Wong Sun v. United States, 371 U.S. 471, 487-88 (1963).

However, the claim on the merits is easily dispatched. We need not consider whether Stroman's seizure is sufficiently linked with the gun and confession, cf. United States v. Kornegay, 410 F.3d 89, 93-94 (1st Cir. 2005), because we think that the seizure itself constituted a Terry stop for which there was ample justification. Unlike an arrest, for which probable cause is required, a Terry stop--which is less intrusive--requires only

reasonable suspicion of Stroman's involvement in wrongdoing.  Terry v. Ohio, 392 U.S. 1, 21 (1968).

If so, Mailhot was entitled to halt and briefly question Stroman, United States v. Sharpe, 470 U.S. 675, 686 (1985), and the attempt to frisk him would itself be justified as a self-protection measure: an officer approaching a suspect in connection with a break-in is entitled to ensure that no weapons are hidden underneath a heavy leather coat.  Terry, 392 U.S. at 27.  Whether (on the undisputed facts) there was a basis for reasonable suspicion is one of those law application issues that we have been told to review de novo.  Ornelas v. United States, 517 U.S. 690, 699 (1996).

Stroman says that when Mailhot approached the car, BJ Almeida and another man were already in custody (only two men had been allegedly involved in the break-in); but Mailhot said that he did not know this and the magistrate judge so found.  Still, Stroman argues he and Almeida look nothing alike; that he was not wearing a t-shirt (as reported of the break-in suspects); and that he was accompanied by a woman (the report of the break-in had not mentioned a woman).

Yet the car, oddly parked near the location of the alleged crime, bore Massachusetts plates (the reported break-in was associated with a Massachusetts suspect); two individuals were in the back-seat at a very early hour of the morning; and one of them

(Stroman) left the car as the officer approached, walking in the opposite direction and ignoring directions to stop. Further, Stroman was wearing a leather coat in July, a fact that the officer reasonably considered curious and perhaps suggestive of hidden weapons.

All of these elements have been noted in cases as relevant--the car location, Kimball, 25 F.3d at 6, the "unprovoked flight," Illinois v. Wardlow, 528 U.S. 119, 125 (2000), the unusual dress, United States v. Maguire, 359 F.3d 71, 77 (1st Cir. 2004)-- and common sense would make them relevant anyway. The high-crime nature of the neighborhood is also rationally relevant although sometimes debated on policy grounds.[2] Regardless of the neighborhood, Mailhot had ample reason to detain Stroman briefly.

Turning to the fifth amendment issue, we put to one side the government's claim that Stroman did not fully preserve his objection because he complained during the closing about only one of the prosecutor's several "not contradicted" comments and then made a broader objection only after the jury had retired. On balance, we think that defense counsel made his concerns known once it became clear that the prosecutor was using the debatable language as a theme, and that here that was sufficient.

---

[2]Compare, e.g., United States v. Trullo, 809 F.2d 108, 111 (1st Cir. 1987) (majority opinion), cert. denied, 482 U.S. 916 (1987), with id. at 116 (Bownes, J., dissenting). See also United States v. Goddard, No. 05-3080, 2007 U.S. App. LEXIS 14828 at *18, *35 (D.C. Cir. June 22, 2007) (Brown, J., dissenting).

-8-

Although the fifth amendment's text precludes only legally compelled self-incrimination (i.e., holding reticent defendants in contempt), the Supreme Court announced in Griffin v. California, 380 U.S. 609 (1965), that "comment on the refusal to testify" burdens the constitutional privilege and is therefore prohibited. Id. at 614. Thus the judge may not instruct, or the prosecutor ask, a jury to take the defendant's exercise of his fifth amendment rights as an implication of guilt.

Griffin itself concerned direct and pointed references to a defendant's lack of testimony. Indirect reference, under certain circumstances, is also within the ban. We have said that the test is

> whether, in the circumstances of the particular case, the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.

United States v. Lilly, 983 F.2d 300, 307 (1st Cir. 1992) (quoting United States v. Glantz, 810 F.2d 316, 322 (1st Cir. 1987), cert. denied, 482 U.S. 929 (1987)) (internal quotation marks omitted); see also United States v. Cotnam, 88 F.3d 487, 497 (7th Cir. 1996), cert. denied, 519 U.S. 942 (1996).

At the same time, the prosecutor is entitled to draw the jury's attention to the balance of evidence on contested issues. After all, putting on the government's case is a sort of compulsion of the defendant to answer it; and the government "must also be

-9-

free to engage in normal advocacy so long as it does not point a finger at the accused's remaining silent in the courtroom." United States ex rel. Leak v. Follette, 418 F.2d 1266, 1268 (2d Cir. 1969) (Friendly, J.), cert. denied, 397 U.S. 1050 (1970). More recently, the Supreme Court itself warned against extending "broad dicta" in Griffin so as to deny the prosecutor "the opportunity to meet fairly the evidence and arguments" of the defense. United States v. Robinson, 485 U.S. 25, 33 (1988).

Indeed, in Robinson, the Supreme Court expressly qualified Griffin and carved out an exception for prosecutors who directly and deliberately refer to a defendant's lack of testimony while "fairly responding to an argument of the defendant." Robinson, 485 U.S. at 34. In that case, defense counsel claimed that defendant had never been given a chance to tell his side of the story. In other words, there are pressures in both directions, and the effort is to seek a practical resolution.

Some of our earlier case law might seem to support a mechanical test whereby error occurred wherever a prosecutor referred to a lack of defense evidence and that evidence could only have been supplied by the defendant himself, United States v. Flannery, 451 F.2d 880, 882 (1st Cir. 1971), but such a reading would hardly comport with Robinson. We think that a better guide is our later and more nuanced test in Lilly, taking account of considered intention and inevitable effect in the context of the

-10-

particular facts and of <u>Robinson</u>'s caution as to the prosecutor's right to a fair reply. <u>Accord</u> <u>United States</u> v. <u>Francis</u>, 82 F.3d 77, 79 (4th Cir. 1996), <u>cert. denied</u>, 517 U.S. 1250 (1996).

In this instance, the prosecutor was faced with a claim that the confession was flawed and unreliable due to the agents' unfairness and misunderstandings by the defendant, and that little direct evidence linked Stroman to the gun: it was not on his person and his fingerprints did not match the one on the gun. Although the prosecutor had useful circumstantial evidence (Stroman's flight, the location of the gun, Jose Almeida's remark), the prosecutor had special reason to attempt to corroborate the confession.

Further, defense counsel repeatedly attacked the reliability of the confession in cross examination and in the closing argument, and the judge instructed the jurors that when considering the confession they should consider "circumstances tending to corroborate or contradict the version of events described in the statement." The prosecutor's response was to take elements of the confession one by one and to summarize the government's evidence for the fact (<u>e.g.</u>, that Stroman drove to Maine with the Almeida brothers) and then point to what was or was not on the other side.

In this case, other witnesses, like the Almeida brothers or the woman in the back-seat of the car, could have contradicted

-11-

many elements of the confession if they were untrue, although admittedly not all: Stroman's confession that he hid the gun when he was alone in the building, for example, might realistically have been difficult to contradict without Stroman's own testimony. If the comments are taken together, this is far from a case of naked finger-pointing at the defendant.

The prosecutor does take a risk whenever the "not contradicted" argument is made. But, in this case, the prosecutor had a perfectly legitimate reason for summing up the evidence on each side. There is nothing like a "manifest[] inten[t]" on the prosecutor's part to focus the jury's attention on the defendant's silence; nor do we think that the jury would "naturally and necessarily take [the remarks] to be a comment on the failure of the accused to testify." Cf. United States v. Laboy-Delgado, 84 F.3d 22, 31 (1st Cir. 1996).

Affirmed.