## STATE OF CONNECTICUT *v.* ROGER RUFFIN
### (AC 34640)

DiPentima, C. J., and Beach and McDonald, Js.

Argued November 27, 2012—officially released July 30, 2013

*Raymond L. Durelli*, assigned counsel, for the appellant (defendant).

*Melissa L. Streeto*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Robin D. Krawczyk*, senior assistant state's attorney, for the appellee (state).

*Opinion*

DiPENTIMA, C. J. The defendant, Roger Ruffin, appeals from the judgment of conviction, rendered after a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), two counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2), risk of injury to a child in violation of General Statutes § 53-21 (a) (1) and sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (1) (A). On appeal, the defendant claims that his due process rights were violated when (1) the trial court considered pending charges against him in a separate case for similar offenses during sentencing, (2) the prosecutor improperly (a) used the testimony of a clinical child interview specialist to bolster the victim's

credibility and (b) commented on the defendant's right to testify during her closing argument, and (3) the court refused to give an instruction regarding inconsistencies in the victim's testimony to the jury. We disagree that the defendant was denied due process on any of the claims. We therefore affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In January, 2009, the victim was twelve years old.[1] At that time, the defendant, although married to another woman, had been dating the victim's mother for ten years. During the course of his relationship with the victim's mother, the defendant spent time alone with the victim. The defendant has four children of his own, one of whom is a daughter similar in age to the victim. The defendant's daughter socialized with the victim and her mother occasionally.

The victim identified two separate instances of abuse. First, in January, 2009, the defendant picked up the victim in order to take her to his daughter's birthday party. Instead of going to the party, the defendant stopped his car in Keney Park in Hartford. The defendant then asked the victim whether she had any pubic hair. The victim replied that she did not, and the defendant asked to see. The defendant then "tugg[ed]" on the waist of the victim's shorts, pulled her shorts and her underwear down, and touched her vagina. The victim told the defendant to stop and that she felt uncomfortable, at which point the defendant stopped and drove the victim home. The defendant told the victim not to tell her mother, and when he parked the car to drop the victim off, he kissed her and put his tongue in her mouth; he also told the victim not to tell her

---

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

mother about the kiss. A couple of weeks later,[2] the
defendant again drove the victim to Keney Park and
stopped his car. He asked the victim to "suck his penis
. . . ." When the victim told him no, the defendant
unzipped his pants, forced the victim's head down with
his hand and put his penis into the victim's mouth.[3] The
defendant moved the victim's head "up and down" on
his penis with his hand, until the victim told the defen-
dant that she could not breathe and that she wanted
to go home. The defendant took the victim home. The
victim "eventually" told her mother about the first inci-
dent when the defendant touched her vagina, but she
did not tell her mother about the defendant forcing her
to perform oral sex.

On January 30, 2009, police Officer James Fierravanti
was called to the victim's home on a sexual assault
complaint. Fierravanti spoke with the victim for about
twenty minutes, in which time the victim told Fierra-
vanti that the defendant had taken her to the park,
asked if she had pubic hair and "attempted to look";
she did not say there was any physical contact between
the defendant and herself. Fierravanti left the victim's
home and immediately filed a report with the detective
division. In February, 2009, police Detective Edward
Foster contacted the victim at her house. The victim
confirmed the information she had given to Fierravanti
and added information that was not in Fierravanti's
original report. The victim told Foster that the defen-
dant had touched her vagina on the first day in the
park; she also disclosed that the defendant had forced
her to perform oral sex. Foster arranged for the Aetna

---

[2] The victim testified that it was "[a] couple of weeks, like, one or two,"
in response to the prosecutor's question of how long it was between the
first and second incidents of abuse.

[3] The victim testified: "My mouth was open, so his penis had went into
my mouth."

Foundation Children's Center (Aetna) to interview the victim.[4]

On March 31, 2009, the victim spoke with clinical child interview specialist Erin Byrne. Foster observed the interview with Byrne from behind one-way glass. With the information gathered from the victim's interviews with him and Byrne, Foster obtained and then executed an arrest warrant for the defendant.

In September, 2010, the defendant pleaded not guilty to all charges and proceeded to be tried by a jury. At trial, the state called the victim, the victim's mother, Fierravanti, Foster and Byrne. The defendant called an investigative social worker from the Department of Children and Families, Kareem Muhammad, and the defendant's wife. During the victim's testimony, she stated that she had told different people about the incidents with the defendant at different times.[5] Further, she testified that she could not remember how many times the defendant had kissed her.

During direct examination, the prosecutor asked Byrne to explain her procedure in interviewing a child who complains of sexual abuse. Byrne described the "nationally recognized protocol" that she uses during interviews and noted that her style of interviewing depends on the age of the child with whom she is speaking. Further, Byrne explained to the jury about "delayed disclosure," a situation in which a child, for various reasons, does not divulge incidents of sexual abuse. At the conclusion of her examination, the prosecutor asked Byrne what recommendations she makes

[4] Foster testified that the police "usually" ask Aetna to interview a child when a child makes a disclosure such as the victim did.

[5] The victim testified to her inability to recall specific details of the incidents. Under cross-examination, when defense counsel asked the victim why she did not tell her mother about the defendant's having forced her to perform oral sex, the victim stated: "It didn't cross my mind." Such inability is consistent with the testimony given by Byrne regarding delayed disclosure.

for children after she has interviewed them.[6] Byrne responded that she would make recommendations if a child needs counseling services; she also stated that she "typically" recommends a medical examination for a child after the interview. When the prosecutor asked if she made any recommendations for the victim, Byrne answered that she recommended "counseling services as well as a medical [examination]."

In her closing argument, the prosecutor discussed the victim's testimony. After discussing the details and timing of the victim's disclosures, the prosecutor asked the jury to consider the credibility of the victim's statements.[7] In discussing the victim's testimony and the victim's mother's testimony, the prosecutor stated in relevant part: "No person's testimony here gave you any reason to disbelieve [the victim], nor were you given any reason why the facts that she described could not have happened the way she described them. No person's testimony pointed to any reason why [the victim] would be lying or talked about a time when she did lie, or pointed to any motivation at all as to why [the victim] would falsely accuse [the defendant] of these crimes. Also, no person's testimony pointed to any reason why [the victim's] mother . . . would put her up to this."

Prior to closing arguments, defense counsel had requested an instruction on the purportedly inconsistent statements in the victim's testimony.[8] The court

_____

[6] Specifically, the prosecutor asked: "You said earlier that your purpose in doing the interview is to gather information to make certain recommendations. What types of recommendations would you make?"

[7] The prosecutor stated in relevant part: "[O]bjectively, if [the victim is] making up an allegation, why add something like he pulled over and asked me if I had any pubic hair, and then when I told him no, he pulled over my shorts? Why are you adding that kind of detail? Where does that come from? Doesn't that added detail give the testimony more grain of truth?"

[8] The prosecutor replied in relevant part: "[The victim] wasn't inconsistent in her—in what she disclosed about the oral sex. It was rather something that was omitted the first time, and then during the second interview, she did disclose that information to the police officers. The only thing that I thought that might have been inconsistent was when she was first inter-

indicated that it would charge on constancy of accusation and inconsistent statements concerning the testimony of the victim's mother.[9] The court refused, however, to give an instruction on inconsistent statements made by the victim;[10] it distinguished the victim's mother's statements from the victim's, noting that the victim's were "incremental" and not in the nature of what case law defines as inconsistent testimony. A jury found the defendant guilty on all counts in September, 2010.

At the sentencing hearing in November, 2010, the prosecutor described her experience with sexual assault cases and noted her belief that the defendant was "working his way up" to more serious conduct with the victim.[11] The prosecutor noted that there was another pending case against the defendant with charges similar to those in the present case and described discussions the prosecutor had had with the complainant in the pending case, and with that complainant's mother. The victim's mother also spoke at the

viewed, she said that she wasn't touched and then in the second interview she said that she was."

[9] In setting out its plan for the jury instruction, the court stated in relevant part: "The court indicated it would charge on constancy of accusation, and I indicated that would concern the testimony of . . . [the victim's] mother; Officer Fierravanti, and Detective Edward Foster. . . . [T]he court indicated it would give [a charge on inconsistent statements] concerning [the victim's mother's] testimony and the capacity that when Mr. Muhammad interviewed her, there's a claim or could be a claim that the answer she gave Mr. Muhammad differed from her court testimony."

[10] The court stated in relevant part: "My understanding was that [the victim] had maybe claimed that she made additional disclosures of what may have happened to her, but it didn't appear to me at the time to be . . . in the nature of inconsistency. . . . I think it's incremental and not in the nature of what we—our case law calls inconsistent testimony."

[11] The prosecutor stated in relevant part: "This defendant, in my opinion, was working his way up to more serious conduct. He started off with touching this victim, and then the next time it was fellatio. And if there had been a next time, of which I have no doubt, he probably would have pushed the conduct even more and perpetrated worse acts on her."

sentencing hearing. After these statements, the court stated: "The state's attorney, in her comments, indicated that there may be others or words to the effect that there may be other victims out there that haven't come forward, and [the victim's mother] indicated that type of thing. I don't know, but I'm not going to engage in speculation. . . . Also, as far as the [pending case] goes, that's not going to impact the sentence on this file. The court does consider it to the extent that it corroborates in the court's mind to a substantial degree, generally, the behavior that was described by [the victim]. But other than that, I am not going to consider it." The defendant's attorney spoke of the defendant's many positive qualities, and the defendant's wife spoke in his favor. The court noted that it did not doubt that the defendant had affected many people in a positive way and that his sentencing was particularly difficult due to the defendant's previously "unblemished" record. In light of the record, the testimony and the gravity of the crimes of which the defendant was found guilty, the court sentenced him to serve ten years in prison on the charge of sexual assault in the first degree in violation of § 53a-70 (a) (2) (five years mandatory minimum and eight years of special parole); seven years on the charge of risk of injury to a child in violation of § 53-21 (a) (2) (five years mandatory minimum); five years on the charge of risk of injury to a child in violation of § 53-21 (a) (1); five years on the charge of sexual assault in the fourth degree in violation of § 53a-73a (a) (1) (A); and five years on the charge of risk of injury to a child in violation of § 53-21 (a) (2). All sentences were to be served concurrently. This appeal followed.

I

We turn first to the question of whether the court violated the defendant's due process rights at sentencing. The defendant alleges that the court unduly considered pending charges against him and relied on allegations made in that case. We disagree.

The defendant acknowledges that this claim was unpreserved and therefore seeks review under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). Pursuant to *Golding*, a defendant may successfully obtain review of a claim of constitutional error not preserved at trial only if all four of the following conditions are met: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." Id., 239–40. Here, the record is adequate to review the defendant's claim and the issue of a denial of due process at sentencing is an issue of constitutional magnitude. Thus, we turn to the third requirement under *Golding*. The state argues that the defendant cannot establish a clear constitutional violation. We agree with the state.

"[A] trial court possesses, within statutorily prescribed limits, broad discretion in sentencing matters. On appeal, we will disturb a trial court's sentencing decision only if that discretion clearly has been abused." *State* v. *Kelly*, 256 Conn. 23, 80–81, 770 A.2d 908 (2001). "Consistent with due process the trial court may consider responsible unsworn or out-of-court information relative to the circumstances of the crime and to the convicted person's life and circumstance." (Internal quotation marks omitted.) *State* v. *Lopez*, 280 Conn. 779, 787, 911 A.2d 1099 (2007). "To arrive at a just sentence, a sentencing judge may consider . . . evidence of crimes for which the defendant was indicted but neither tried nor convicted . . . evidence bearing on charges for which the defendant was acquitted . . . and evidence of counts of an indictment which has been dismissed by the government." (Citations omitted.)

*State* v. *Huey*, 199 Conn. 121, 126, 505 A.2d 1242 (1986). "The trial court's discretion, however, is not completely unfettered. As a matter of due process, information may be considered as a basis for a sentence only if it has some minimal indicium of reliability. . . . As long as the sentencing judge has a reasonable, persuasive basis for relying on the information which he uses to fashion his ultimate sentence, an appellate court should not interfere with his discretion." (Citation omitted.) Id., 127.

Here, the court noted specifically that it was considering only the defendant's pending charges and any discussion of those charges, including the prosecutor's and the victim's mother's implications, made during the sentencing hearing, that other victims may exist,[12] to the extent that they corroborated the victim's testimony. The court noted further that it found the victim credible, and that the jury had found her credible as well. The court specifically stated that it would not speculate as to the details of the pending case or to the existence of other victims. The court did take the details of the presentence report into account, in which the court noted were statements made by the defendant's family and friends in his favor. Further, the court noted defense counsel's argument that it should take into account the defendant's "exemplary life" up until the incidents with the victim, and the court recognized the defendant's "unblemished record" prior to this matter and the pending matter. This information, some of which was unsworn and outside of the record, was

---

[12] The victim's mother stated in relevant part: "What [the defendant] did [to the victim] was the most unspeakable thing a grown man can do to a child. This is a child that [the defendant] hurt. Not one, but two children. Who's to say that there aren't more kids that are a victim because of him?

"[The defendant] walks around here in this suit like he's the man. [The defendant is] a monster. [The defendant is] a child molester. [The defendant is] a monster. And he needs to go away for a very long time so he doesn't hurt another child."

within the court's discretion to consider in arriving at a just sentence for the crimes of which the defendant was convicted. See *State* v. *Lopez,* supra, 280 Conn. 787. Thus, the defendant's due process claim fails under the third prong of *Golding* such that we decline to review his claim further.

## II

The defendant next claims that he was denied due process because of prosecutorial impropriety. Specifically, the defendant alleges that the prosecutor improperly (1) bolstered the victim's credibility through her questioning of Byrne and (2) commented on the defendant's right to testify in her closing argument. The state responds that the defendant's first claim of impropriety is, in actuality, an unpreserved evidentiary claim. We agree with the state. With regard to the defendant's second claim of impropriety, we disagree that an impropriety occurred.

## A

We turn first to the defendant's claim that the prosecutor improperly bolstered the victim's credibility. Specifically, the defendant argues that through the prosecutor's questioning, Byrne testified to the victim's credibility by stating that the victim disclosed abuse during their interview and that she had therefore recommended a medical examination as well as counseling services.

The defendant did not object to the questioning or seek to strike the responsive testimony at trial, and argues on appeal that they should nevertheless be reviewed under *State* v. *Williams,* 204 Conn. 523, 529 A.2d 653 (1987), and *State* v. *Warholic,* 278 Conn. 354,

897 A.2d 569 (2006).[13] Although the defendant argues in both his appellate briefs that the prosecutor elicited improper testimony from Byrne, his actual claim takes issue with Byrne's testimony that she recommended counseling and a medical examination after interviewing the victim.[14] Thus his claim is evidentiary in nature.[15] "Although our Supreme Court has held that unpreserved claims of prosecutorial impropriety are to be reviewed under the *Williams* factors, that rule does not pertain to mere evidentiary claims masquerading as constitutional violations. . . . Evidentiary claims do

[13] "[A] defendant who fails to preserve claims of prosecutorial [impropriety] need not seek to prevail under the specific requirements of *State* v. *Golding*, [supra, 213 Conn. 239–40], and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test." (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 360.

[14] In his brief, the defendant argued in relevant part: "Despite Byrne's testimony that it was not her role to decide if a child is credible or not credible, she did precisely that. The prosecutor asked Byrne what types of recommendations she make[s] after conducting a diagnostic interview. Byrne responded she would typically recommend a medical exam, and would recommend counseling services if a child needed such services. The prosecutor showed Byrne the [victim's] birth certificate. Byrne reviewed the birth certificate and testified she conducted a diagnostic interview with the [victim] on March 31, 2009. The prosecutor asked her what recommendations she made after conducting the interview. Byrne responded: 'I recommended counseling services as well as medical.' " The defendant went on to argue against the "gist of Byrne's testimony."

[15] We acknowledge our Supreme Court's recent decision in *State* v. *George A.*, 308 Conn. 274, 63 A.3d 918 (2013). That case presented a similar fact pattern to this case, in which a young girl claimed sexual assault by an older male and expert testimony played a prominent role in the state's case against the defendant. Further, the court therein examined the challenge to the expert's testimony as an evidentiary question and determined that it was not plain error for the trial court to admit such evidence. Id., 286–87. While we note the similarity between the facts and the expertise behind the testimony in *George A.* and this case, we distinguish *George A.* from this case because of the actual testimony given. In *George A.*, the expert testified, in relevant part, that "[m]y assessment was that this was a [thirteen] year old girl who had suffered an extensive history of severe maltreatment by [the defendant]." (Internal quotation marks omitted.) Id., 287. In this case, Byrne testified solely that she recommended medical treatment and counseling services without commenting on why she recommended those services specifically for the victim.

not merit review pursuant to *Golding* . . . because they are not of constitutional magnitude. [R]obing garden variety claims [of an evidentiary nature] in the majestic garb of constitutional claims does not make such claims constitutional in nature. . . . Putting a constitutional tag on a nonconstitutional claim will no more change its essential character than calling a bull a cow will change its gender." (Citation omitted; internal quotation marks omitted.) *State* v. *Cromety*, 102 Conn. App. 425, 431, 925 A.2d 1133, cert. denied, 284 Conn. 912, 931 A.2d 932 (2007).

The challenge to Byrne's testimony is evidentiary in nature and unpreserved. It cannot be characterized fairly as prosecutorial impropriety, and consequently it is not reviewable under *Williams* or *Warholic*. Accordingly, we decline to review the defendant's argument of impropriety as to this claim.

B

We turn next to the defendant's claim that there was impropriety in the prosecutor's closing argument. The defendant specifically claims that the prosecutor commented on his failure to testify. We disagree.

We note that although the defendant did not raise this claim at trial, we may nevertheless review its merits on appeal. "[A] defendant who fails to preserve claims of prosecutorial [impropriety] need not seek to prevail under the specific requirements of *State* v. *Golding*, [supra, 213 Conn. 239–40], and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test." (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 360. Instead, we apply the factors established in *State* v. *Williams*, supra, 204 Conn. 540.

Prosecutorial impropriety of a constitutional magnitude can occur during closing arguments. Id., 539. "In

analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial." (Citations omitted.) *State* v. *Fauci*, 282 Conn. 23, 32, 917 A.2d 978 (2007).

"It is well settled that comment by the prosecuting attorney . . . on the defendant's failure to testify is prohibited by the fifth amendment to the United States constitution. . . . In determining whether a prosecutor's comments have encroached upon a defendant's right to remain silent, we ask: Was the language used manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify? . . . Further, in applying this test, we must look to the context in which the statement was made in order to determine the manifest intention which prompted it and its natural and necessary impact upon the jury. . . . Finally, [w]e also recognize that the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Citation omitted; internal quotation marks omitted.) *State* v. *Parrott*, 262 Conn. 276, 292–93, 811 A.2d 705 (2003).

The defendant relies on *State* v. *Rizzo*, 266 Conn. 171, 833 A.2d 363 (2003), to support his claim. This case is markedly distinct from *Rizzo*. In *Rizzo*, the prosecutor's closing remarks included: "And then on top of all this [defense counsel] comes up and says well, one of the things you [have] got to take into consideration here, one of the mitigating factors we've proven is [the defendant's] taking responsibility. I didn't hear

him take responsibility once." (Emphasis omitted; internal quotation marks omitted.) Id., 270. The prosecutor directly referred to the defendant and noted his failure to testify and defend himself. Here, on the other hand, the prosecutor stated, in relevant part: "No person's testimony here gave you any reason to disbelieve [the victim], nor were you given any reason why the facts that she described could not have happened the way she described them. No person's testimony pointed to any reason why [the victim] would be lying or talked about a time when she did lie, or pointed to any motivation at all as to why [the victim] would falsely accuse [the defendant] of these crimes. Also, no person's testimony pointed to any reason why [the victim's] mother . . . would put her up to this." The prosecutor did not directly discuss the defendant. She merely noted the consistency of the various testimony given at trial with the victim's version of events.

The defendant also cites *State* v. *DeMartino*, 7 Conn. App. 292, 508 A.2d 809 (1986), for support. That case is also distinguishable from the facts in this case. There, as in *Rizzo*, the prosecutor directly referred to the defendant, stating in relevant part: "Why wouldn't [the defendant] tell the police the name of the person that he knew [was] involved in this investigation . . . ." (Internal quotation marks omitted.) Id., 293. The prosecutor clearly implied that the defendant himself was the only person who could provide the information. Id., 295. Again, this is not the case here. The prosecutor never named the defendant and only discussed witnesses aside from the victim as corroborating the victim's testimony.

There is strong Connecticut precedent supporting the state's position that there was no prosecutorial impropriety. In *State* v. *Correa*, 241 Conn. 322, 359, 696 A.2d 944 (1997), the court determined that there was no impropriety where the prosecutor stated in relevant

part: "[D]efense counsel [relied] on things the defendant said in his statement to the police, a statement that we can't cross-examine, but . . . in that statement, the defendant says he found the box in his car." (Internal quotation marks omitted.) Id. Considering the totality of the statement in context with the prosecutor's closing argument and rebuttal, the court concluded that the prosecutor was not "naturally and necessarily" commenting on the defendant's refusal to testify, but, rather, on the weight to be afforded to the defendant's statements to the police. Id., 359–60. Here, too, the prosecutor was not referring to the defendant's failure to testify, but rather was commenting on the credibility of the victim's testimony. See *State* v. *Cromety*, supra, 102 Conn. App. 439 ("[a] prosecutor may properly comment on the credibility of a witness where such comment reflects reasonable inferences from evidence adduced at trial" [internal quotation marks omitted]).

Similarly, in *State* v. *Johnson*, 107 Conn. App. 188, 944 A.2d 416, cert. denied, 288 Conn. 905, 953 A.2d 650 (2008), a sexual assault and risk of injury to a child case, there was no impropriety found where the defendant claimed that by noting that the victim had testified under oath, the prosecutor was indirectly making reference to the defendant's failure to testify. The prosecutor stated in relevant part: "We have a sixteen year old girl who has had something happen to her, she says. This thing has caused her some difficulty over the years; it has preyed on her mind in some kind of way. She has raised it in different forums with different people in different settings at different times over the last couple of years. She has taken an oath, an oath that you might find has real significance for her based on what is undisputedly a very religious and devout life. That's something for you to consider when you consider her taking the oath and making these statements under oath." (Internal quotation marks omitted.) Id., 196. Here, as

in *Johnson*, the prosecutor never mentioned the defendant, and the defendant's claim lies in a supposed implication that he argues was made to the jury but which is unsupported by the context of the prosecutor's statements in her closing.

"[I]n determining the effect of the state's words on the jury, we may consider the effect they had on defense counsel." (Internal quotation marks omitted.) *State* v. *Rizzo*, supra, 266 Conn. 269–70. Here, defense counsel did not object at trial. In his reply brief, the defendant notes that counsel did not object to the prosecutor's statement. Although not dispositive of the effect the statement may have had on the jury, the fact that defense counsel did not object to the statement at the time is relevant to the issue of the statement's severity. In *State* v. *Cobb*, 27 Conn. App. 601, 605 A.2d 1385 (1992), this court held that a comment made in the presence of the jury, but during argument to the judge directly, was not impropriety when the prosecutor said in relevant part: "If Mr. Cobb got on the stand and testified to that, then I could see the point." (Internal quotation marks omitted.) Id., 608. The court inferred from defense counsel's failure to object when the prosecutor made the statement that defense counsel did not believe that the statement could be construed by the jurors to mean that they should draw an inference of guilt from the defendant's failure to testify. Id., 609.

The prosecutor's remarks here neither directly referred to the defendant nor triggered an objection from defense counsel. The remarks were not of such character that the jury would naturally and necessarily take them to be a comment on the failure of the accused to testify. See *State* v. *Parrott*, supra, 262 Conn. 292. We conclude, therefore, that the prosecutor did not

improperly comment on the defendant's failure to testify.[16]

## III

Finally, we address the defendant's claim that the court improperly refused to give an instruction on inconsistencies in the victim's testimony. Specifically, the defendant argues that the court improperly refused to instruct the jury that the victim's details of the incidents with the defendant as reported to the police were inconsistent with her trial testimony. We disagree.

"Jury instructions are calculated to give the jurors a clear understanding of the elements of the crime charged, and to afford them proper guidance for their determination of whether those elements were present." (Internal quotation marks omitted.) *State* v. *Usry*, 205 Conn. 298, 316, 533 A.2d 212 (1987). "Even where . . . prior inconsistent statements are admitted into evidence . . . the court is not required to give a specific charge concerning the statements, at least where the inconsistencies are not substantial and do not relate to a material matter." (Internal quotation marks omitted.) *State* v. *Herring*, 55 Conn. App. 522, 526, 739 A.2d 1290 (1999), cert. denied, 252 Conn. 941, 747 A.2d 521 (2000). A court need not devise special jury instructions to be given when a prior inconsistent statement is the primary or exclusive evidence relied upon by the state. *State* v. *Newsome*, 238 Conn. 588, 620, 682 A.2d 972 (1996). A "trial court's instruction, in specifically calling the jury's attention to the assessment of witnesses' prior inconsistent statements and their explanations, if any, for such contradictions as well as a consideration of a witness' interest in the outcome of the case, [is] generally sufficient to focus its attention on the need to be

---

[16] Because we do not find impropriety, as the defendant claimed, we need not address the factors set forth in *State* v. *Williams*, supra, 204 Conn. 540, to determine a violation of due process.

especially careful in assessing the believability and worth of [the witness'] prior statement . . . ." (Internal quotation marks omitted.) Id., 622.

At the charging conference, the defendant asked the court for a specific instruction on the inconsistencies between the statements the victim originally made to the victim's mother, the statements she made to Fierravanti and Foster, and her testimony in court. The court stated that it would instruct on the prior inconsistent statements made by the victim's mother, but that it would not instruct on statements made by the victim because they were incremental and not in the nature of inconsistent statements that require specific instruction.[17] The court's general instructions did address prior inconsistent statements, and the court specifically called the jury's attention to its role in determining the credibility of the testimony of the victim, the victim's mother and the other witnesses. The court instructed in relevant part: "In deciding what the facts are, you must consider all the evidence. In doing this, you must decide which testimony to believe and which testimony not to believe. . . . In making that decision, you may take into account a number of factors, including the following; one, was the witness able to see, hear, or know the things about which that witness testified; two, how well was the witness able to recall and describe those things; three, what was the witness' manner while testifying; four, did the witness have an interest in the outcome of this case or any bias or prejudice concerning any party or any matter involved in this case; five, how reasonable was the witness' testimony considered in the light of all the evidence in the case; and six, was the witness' testimony contradicted by what that witness has said or done at another time or by the testimony of other witnesses or by other evidence."

---

[17] See footnotes 8 through 10 of this opinion and accompanying text.

The court also specifically instructed the jury on how to view inconsistencies and discussed the testimony of the victim's mother, Fierravanti and Foster in relation to the victim's testimony and earlier statements. The court instructed in relevant part: "[T]here's an area of law that we call constancy of accusation, and this particular charge refers to the testimony of [the victim's mother] . . . Fierravanti and . . . Foster. This is when [the victim] told them what allegedly occurred. The [victim] testified here in court before you. You may use her testimony as evidence and proof of the facts asserted in that testimony, and give it the weight you find is reasonable." The court instructed the jury that the evidence of the out-of-court statements made to the victim's mother, Fierravanti and Foster "is to be considered by you only in determining the weight and credibility that you will give the [victim's] testimony as it pertains to the charge of sexual assault or the risk of injury. This evidence of out-of-court statements by [the victim] of a sexual assault against her by the defendant is not to be considered by you to prove the truth of the matter asserted in those out-of-court statements." Finally, the court instructed the jury on how to evaluate evidence if it found inconsistencies: "Should [you] find that what [the victim] has said outside the courtroom is inconsistent with her testimony in court, you may consider the degree of inconsistency which you find and you may consider the reasons which you may find for the inconsistency in evaluating her testimony given in court."

The court sufficiently drew the jury's attention to the victim's testimony and to the testimony of those to whom she recounted the incidents prior to trial in order for the jury to assess the credibility of and weight to be given to the victim's prior statements. To prove instructional error, a defendant must show that it is reasonably possible that the jury was misled by the lack

of instruction; see *State* v. *Aviles*, 277 Conn. 281, 309, 891 A.2d 935, cert. denied, 549 U.S. 840, 127 S. Ct. 108, 166 L. Ed. 2d 69 (2006); the defendant has not done so. As the defendant himself notes, the court's instructions show recognition of the different statements given to the victim's mother, Fierravanti, Foster and in court, but it was within the court's purview to determine these statements as "incremental" rather than inconsistent and therefore not to instruct on them specifically. The court provided the jury with sufficient instruction on the statements, the nature of testimonial evidence, the nature of inconsistent evidence and the jury's role in determining witness credibility. The defendant was not prejudiced by the lack of a specific instruction on inconsistencies in the victim's testimony. We therefore do not find error in the court's instruction.

The judgment is affirmed.

In this opinion BEACH, J., concurred.

MCDONALD, J., concurring in part and dissenting in part. Although I agree with part I and part III[1] of the majority opinion, I respectfully disagree with part II of the majority opinion. In my opinion, the due process rights of the defendant, Roger Ruffin, were violated when the prosecutor improperly commented, during closing argument, on the defendant's failure to testify and contradict the testimony of the state's principal witness, J. F., while also arguing, improperly, the state's evidence established circumstances to support J. F.'s allegations of sexual abuse as detailed by an expert sexual abuse child interviewer.

---

[1] As to part III of the majority opinion, I concur because the defendant's trial counsel agreed to the court's observation that partial disclosure did not constitute an inconsistent statement that I view as invited error. *State* v. *Kitchens*, 299 Conn. 447, 468–69, 10 A.3d 942 (2011); *State* v. *Gibson*, 270 Conn. 55, 66–67, 850 A.2d 1040 (2004).

J. F. testified that in early January, 2009, the defendant, her mother's former boyfriend, touched the top of her vagina, put his tongue in her mouth and, about a week or two later, forced her to perform oral sex. She testified that both times she was alone with the defendant in his automobile.

The defendant argues that the prosecutor improperly referred to the defendant's failure to testify. He argues correctly that even an indirect remark may violate the prohibition against referring to the defendant's failure to testify. *State* v. *Rizzo*, 266 Conn. 171, 269–70, 833 A.2d 363 (2003). This court has stated that a "prosecutor is prohibited from asking for explanations that only the defendant can provide because such questions are an indirect comment on the defendant's failure to testify." *State* v. *Menzies*, 26 Conn. App. 674, 696, 603 A.2d 419, cert. denied, 221 Conn. 924, 608 A.2d 690 (1992); see also *State* v. *DeMartino*, 7 Conn. App. 292, 295, 508 A.2d 809 (1986).

In this case, during the prosecutor's initial closing argument, she stated that J. F.'s testimony was "consistent within itself because there's nothing that she said that couldn't have happened the way she reported it, and there's nothing that she said that conflicted with something someone else said about how it happened."[2]

---

[2] In her initial closing argument, the prosecutor said in relevant part: "J. F.'s testimony about the abuse is consistent within itself because there's nothing that she said that couldn't have happened the way she reported it, and there's nothing that she said that conflicted with something someone else said about how it happened. She told you what the defendant said to her. She reported elements of force and secrecy. She said he forced her head to his penis. She described how he held her—moved her head up and down with his hands or hand. She said he forced his tongue into her mouth. She told you he told her not to tell her mother, and those were all things that Erin Byrne said she looks for to support an allegation. . . .

"No person's testimony here gave you any reason to disbelieve J. F., nor were you given any reason why the facts that she described could not have happened the way she described them. No person's testimony pointed to any reason why J. F. would be lying or talked about a time when she did lie, or pointed to any motivation at all as to why J. F. would falsely accuse Mr. Ruffin of these crimes."

The prosecutor continued that "[n]o person's testimony here gave you any reason to disbelieve J. F., nor were you given any reason why the facts that she described could not have happened the way she described them."

The prosecutor argued that no person's testimony conflicted with J. F. or gave the jury any reason to disbelieve J. F.'s testimony about the sexual abuse. The evidence, as the prosecutor pointed out to the jury, was that the only witnesses to the abuse were J. F. and the defendant, as J. F. testified that both incidents of abuse happened when she was alone with the defendant in his automobile. The evidence was that only the defendant could have provided testimony to conflict with J. F.'s testimony. The defendant was the only other person present during the incidents of abuse to which J. F. testified and that J. F. described to the other prosecution witnesses. The lack of conflicting testimony or testimony giving the jury any reason for disbelief of J. F. was placed upon the defendant's silence at the trial. I would conclude that the state's "no conflicting witness" argument was naturally and necessarily an adverse comment on the defendant's silence that penalized the defendant for exercising his fifth amendment right. It was prosecutorial impropriety. In the words of the United States Court of Appeals for the First Circuit, a "prosecutor does take a risk whenever the 'not contradicted' argument is made." *United States* v. *Stroman*, 500 F.3d 61, 66 (1st Cir.), cert. denied, 552 U.S. 1050, 128 S. Ct. 674, 169 L. Ed. 2d 528 (2007).

On the trial record I also would conclude that only the defendant alone has information to contradict J. F. as to sexual abuse, a situation which, in itself, establishes a constitutional violation if the "not contradicted" comment is made. As the United States Court of Appeals for the Second Circuit held in *United States* v. *Bubar*, 567 F.2d 192, 199 (2d Cir.), cert. denied, 434 U.S. 872, 98 S. Ct. 217, 54 L. Ed. 2d 151 (1977), "[a] constitutional

violation occurs only if either the defendant alone has the information to contradict the government evidence referred to or the jury 'naturally and necessarily' would interpret the summation as a comment on the failure of the accused to testify. *United States ex rel. Leak* v. *Follette*, 418 F.2d 1266 (2d Cir. 1969), cert. denied [sub nom. *Leak* v. *Follette*], 397 U.S. 1050, 90 S. Ct. 1388, 25 L. Ed. 2d 665 [1970])." See also *United States* v. *Gotchis*, 803 F.2d 74, 81 (2d Cir. 1986); *United States* v. *Lipton*, 467 F.2d 1161, 1168 (2d Cir. 1972), cert. denied, 410 U.S. 927, 93 S. Ct. 1358, 35 L. Ed. 2d 587 (1973).

Our Supreme Court has observed in *State* v. *Walker*, 206 Conn. 300, 307, 537 A.2d 1021 (1988), referring to *United States ex rel. Leak* v. *Follette*, supra, 418 F.2d 1269, that the offending language must be naturally and necessarily taken to be a comment on the failure of the accused to testify. The court in *Walker* also noted that in *Leak* remarks concerning lack of contradiction are forbidden in the exceedingly rare case where the defendant alone could possibly contradict the government's testimony. *State* v. *Walker*, supra, 307–308.

During the no conflicting witness portion of the prosecutor's argument, the prosecutor referred to "important" testimony from Erin Byrne, a child interviewer at the Aetna Foundation Children's Center. That center provides evaluation and treatment, as well as protection, for children who have made allegations of sexual abuse. Byrne had been at the center two and one-half years and interviewed 250 to 300 children. Byrne testified that partial or piecemeal disclosure often happens during the process of interviewing children. She also stated that children often times go back to the abuser they knew or trusted.

Byrne testified that it was not her role to decide if the child was credible or not credible. Byrne further

testified that her role was to conduct diagnostic interviews with children, during which she was to look for things to support the child's disclosure of abuse, such as internal consistency, providing the same information at the beginning, middle and end of the interview, providing contextual details of what happened "in the context" with the abuse, before, during and after abuse; providing sensory details, i.e., how something felt; providing details of conversations during or near the time of the abuse, details of the abuse, directions not to tell of the abuse, and threats if the child told or of force used during abuse.[3]

She further testified that she recommended that if a child needed counseling and medical services, including a medical examination, following Byrne's diagnostic interview, she would recommend counseling and medical care. In this case, following the personal diagnostic interview, Byrne did recommend that J. F. required counseling and medical care.

---

[3] Byrne testified as follows:

"[The Prosecutor]: In your capacity as an interviewer, do you make judgment credibility?

"[Byrne]: It is not my role to decide if a child is credible or not credible.

"[The Prosecutor]: Okay. Do you have more?

"[Byrne]: Yes. There are things I look for in an interview to support a child's disclosure.

"[The Prosecutor]: Okay. What types of things do you look for to support disclosure?

"[Byrne]: Well, it is different for every child, but some of the things that we would look for would be internal consistency where the child is able to provide the same information, the beginning, middle, and end of the interview. Are they able to provide contextual details? So were they able to provide details in regards to what was happening in the context in which abuse may have happened or happened before, during or after the abuse. Sensory detail, are they able to provide information relative to how something felt. Reproduction of conversation. Are they able to provide information in regards to the reproduction of two-way conversation that happened during or near the time of the abuse.

"[The Prosecutor]: What about elements of secrecy?

"[Byrne]: Yes. Elements of secrecy is when a child discloses that someone told them to tell or not to tell. For secrecy would be not to tell. Other things we may look for are elements of threats would something happen if you did tell, and elements of force, if they were forced to do something."

In *State* v. *Favoccia*, 306 Conn. 770, 51 A.3d 1002 (2012), our Supreme Court held that it was improper for the state to introduce evidence from an expert of a direct or indirect imprimatur on a sexual assault victim's allegations. In *Favoccia*, the majority, as well as the two dissenting justices, stated that direct or indirect evidence of a diagnosis of sexual abuse by an interviewing expert would constitute an improper vouching for a sexual assault victim's testimony. Our Supreme Court agreed with authorities that testimony tailored to the specific complainant is not necessary "to dispel myths or mistaken beliefs about how sexual assault victims are 'supposed to act.' " Id., 804. The court also "agree[d] with those authorities observing that more specific testimony yields returns that increase in prejudice to the defendant as they diminish in value with respect to the edification of the jury as to behaviors that might affect the complainant's credibility." Id.

The defendant on appeal argues that evidence concerning Byrne's diagnostic interview of J. F. was improper. I agree because the evidence from the expert interviewer might cause the jury to conclude that the interviewer, in making a diagnosis for treatment at the sexual abuse clinic made an indirect assertion that that child had been sexually abused. See id., 794 n.30.

The recommendation for needed treatment in the opinion of Byrne implied the diagnosis was that J. F. had been sexually abused and that J. F.'s disclosure of abuse was supported. Thus, the jury could rely upon the diagnosis and recommendations in its deliberations because the diagnosis and recommendations were made by an experienced sexual abuse interviewer who personally interviewed J. F. Moreover, as the prosecutor argued to the jury, J. F.'s testimony contained those which were "all things that Erin Byrne said she looks for to support an allegation." See footnote 2 of this concurring and dissenting opinion. The state's closing

did state directly that Byrne would and did find J. F.'s interview allegation was supported. In effect, the expert improperly vouched for J. F.'s testimony with testimony of Byrne's support list.[4]

I would then determine that these improprieties deprived the defendant of his due process right to a fair trial. See *State* v. *Singh*, 259 Conn. 693, 793 A.2d 226 (2002).

After weighing the factors set forth in *State* v. *Favoccia*, supra, 306 Conn. 770, *State* v. *Angel T.*, 292 Conn. 262, 287, 973 A.2d 1207 (2009), and *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987), I believe that prosecutorial impropriety deprived the defendant of his due process right to a fair trial and was not harmless. I do not believe that the trial record would support the jury, unaffected by the improprieties, convicting the defendant without believing J. F.'s allegations where no physical evidence from a medical examination supported those allegations.

I would, therefore, set aside the judgment of the trial court and order a new trial.

---

[4] The definition in Webster's Dictionary for "vouch" is "to supply supporting evidence . . . ." Merriam-Webster's Collegiate Dictionary (10th Ed. 1999).