******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

STATE OF CONNECTICUT *v.* ELMER G.*
(SC 20031)

Robinson, C. J., and McDonald, D'Auria, Mullins and Ecker, Js.

*Syllabus*

Convicted of two counts each of the crimes of sexual assault in the second
degree and risk of injury to a child, and three counts of the crime of
criminal violation of a restraining order, the defendant appealed to the
Appellate Court. The defendant, his wife, A, and the minor victim, their
daughter, came to the United States from Guatemala. While living in
Connecticut, the defendant sexually abused the victim and was verbally
and physically abusive toward A and the couple's other children. A
eventually reported the defendant's physical abuse of her to the police
while the defendant was out of the country and obtained an ex parte
restraining order, which was served on him when he returned to the
United States. The ex parte order, inter alia, prohibited the defendant
from contacting A and her children, and denied the defendant visitation
rights pending a hearing. After the hearing, which the defendant attended
with his counsel, the trial court issued a temporary restraining order
that prohibited the defendant from contacting A and contained additional
orders providing that A's children also were protected by the order. The
order also allowed the defendant weekly, supervised visitation with the
children. Other parts of the order reiterated its terms and stated that
violation of the order was a criminal offense and that contacting a
protected person could violate the order. The order also contained a
Spanish translation of its terms on a separate page. At the hearing,
during which the defendant, whose primary language is Spanish, required
an interpreter, the trial court explained the terms of the temporary
restraining order to the defendant. The court stated, inter alia, that the
order prohibited the defendant from assaulting, threatening, abusing or
harassing A and the children and that he was not to have any contact
with A in any manner. The court further stated that the defendant
could have supervised, weekly contact with the children. The defendant
thereafter contacted the victim on three occasions, sending her two text
messages and a letter that he had one of the victim's siblings deliver to
the victim. The Appellate Court upheld the defendant's convictions. In
his certified appeal from the Appellate Court's judgment, the defendant
claimed that the evidence was insufficient to support his conviction of
criminal violation of a restraining order and that the prosecutor commit-
ted certain improprieties while questioning two witnesses and during
closing argument. *Held*:

1. The evidence was sufficient to support the defendant's conviction of three
counts of criminal violation of a restraining order:

a. The defendant could not prevail on his claim that there was insufficient
evidence from which the jury reasonably could conclude that he knew
that the terms of the restraining order prohibited his contact with the
children except during weekly, supervised visitation: although the court
did not expressly state during the hearing that the no contact term
applied to both A and the children, the court specified, immediately
after stating that the no contact term applied to A, that the defendant
could have contact with his children but that it must be supervised and
then clarified that it would be "weekly and supervised," and the victim
advocate similarly characterized the order at the hearing with respect
to contact with the children as being limited to weekly, supervised visits;
moreover, although it was possible for the jury to infer that the court
and the victim advocate meant visitation when they referred at the
hearing to contact in light of subsequent references to visitation, it also
was entitled to infer that the court and the victim advocate meant what
they said when they said contact, and the written temporary restraining
order, the actions of A and the victim in reporting the defendant's
contacts to the police, and the prior, ex parte order all supported the
latter inference.

b. This court found unavailing the defendant's claim that he lacked
knowledge of the terms of the restraining order on the ground that the

record failed to show he was informed in Spanish that he was prohibited from contacting the children by text or letter: the evidence demonstrated that the defendant was fully apprised of the terms of the order in Spanish by defense counsel, the court, and the victim advocate, as defense counsel confirmed with the court that he was fluent enough in Spanish to make the defendant understand what was said in English, counsel stated that he had gone over the proposed order with the defendant in private in a meeting attended by the defendant's sister and the victim advocate, and the defendant was assisted by a Spanish language interpreter during a portion of the hearing and by defense counsel, who acted as an interpreter during the remainder of the hearing; moreover, the fact that the defendant asked the victim's sibling to deliver the letter to the victim rather than delivering it to the victim himself indicated that the defendant knew he was not permitted to contact the children outside of the weekly, supervised visits.

c. The defendant could not prevail on his claim that there was insufficient evidence to establish that he had sent the letter to the victim while the temporary restraining order was in effect and, therefore, that this instance of contact was not in violation of that order; the victim testified that she received the letter during the time the restraining order was in effect, there was evidence that the defendant had given the letter to the victim's sibling for delivery to the victim during one of the supervised visits that was authorized under the order, and the defendant's pleas in the letter for the victim to meet with him suggested that it was written in response to the victim's refusal to attend the court-approved visits.

2. The defendant was not deprived of a fair trial as a result of certain alleged improprieties committed by the prosecutor: the prosecutor's questions to the victim and another witness about whether certain of their testimony was truthful were not improper, as defense counsel put the victim's credibility squarely before the jury throughout the trial, information about the witnesses' motivations to lie was the type of information a jury requires to assess their credibility, the prosecutor's questions were unlikely to confuse the issues for the jury, and, because the evidentiary rule against preemptive bolstering of a witness' testimony has its roots in efficiency rather than fairness, this court declined to rely on it as a basis on which to adjudicate a claim of prosecutorial impropriety; moreover, the prosecutor did not make a golden rule argument when, during closing argument, he asked the jurors to consider their own perspectives in considering certain of the victim's testimony, as the prosecutor's comment was not an attempt to encourage the jurors to believe the victim out of passion or sympathy but was directed at her credibility, which was squarely at issue, and was a permissible attempt to encourage the jurors to infer that the victim was not fabricating her testimony; furthermore, the prosecutor did not improperly evoke sympathy for the victim when he referenced her credibility in light of the psychological, social and physical barriers she faced in accusing the defendant of sexual assault, and the prosecutor's comment asking the jurors whether other individuals in circumstances similar to those of the victim would fabricate sexual assault accusations was not improper, as the comment was a permissible, rhetorical device to encourage the jury to infer that the victim had no motive to fabricate her testimony.

Argued February 22—officially released September 17, 2019

*Procedural History*

Substitute informations charging the defendant, in the first case, with three counts each of the crimes of sexual assault in the second degree and risk of injury to a child, and, in the second case, with three counts of the crime of criminal violation of a restraining order, brought to the Superior Court in the judicial district of Danbury, where the cases were consolidated and tried to the jury before *Pavia, J.*; verdicts and judgments of guilty of two counts each of sexual assault in the second degree and risk of injury to a child, and three counts of criminal violation of a restraining order, from which the defendant appealed to the Appellate Court, *Alvord, Prescott* and *Pellegrino, Js.*, which affirmed the trial

court's judgments, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*Pamela S. Nagy*, assistant public defender, for the appellant (defendant).

*Ronald G. Weller*, senior assistant state's attorney, with whom, on the brief, were *Stephen J. Sedensky III*, state's attorney, and *Warren C. Murray*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

D'AURIA, J. A jury found the defendant, Elmer G., guilty of several offenses stemming from the sexual assault of his minor daughter, including three counts of criminal violation of a restraining order in violation of General Statutes § 53a-223b.[1] The Appellate Court upheld his convictions. *State* v. *Elmer G.*, 176 Conn. App. 343, 383, 170 A.3d 749 (2017). On further appeal to this court, the defendant claims that the state presented insufficient evidence to convict him of any of the counts of criminal violation of a restraining order. In addition, he claims that he was deprived of a fair trial as a result of certain improprieties committed by the prosecutor. We disagree with both claims and affirm the judgment of the Appellate Court.

The jury reasonably could have found the following facts. The victim's parents—the defendant and his former wife, A.N.—originally are from Guatemala. The victim was born to the couple in 1996, and, two years later, the defendant immigrated to the United States. A.N. came to the United States two years after that, leaving the victim in Guatemala with relatives. The defendant and A.N. had four other children after they arrived in the United States.

The defendant would visit Guatemala about once a year. During one of these visits, in 2007, when the victim was about ten years old, the defendant began sexually abusing her. In 2010, when the victim was thirteen years old, the defendant had relatives smuggle her into the United States and to the family's Connecticut home. About two weeks after she arrived, the defendant again started sexually abusing her. The defendant also verbally and physically abused the victim, A.N., and the victim's younger siblings "[a]ll the time."

The Department of Children and Families (department) twice investigated allegations that the defendant had abused family members. In June, 2011, it investigated a report that the defendant had physically abused one of the victim's younger brothers. In January, 2012, the defendant left the United States for a planned visit to Guatemala. Soon after he left, one of the victim's brothers complained to school officials about a recent incident in which the defendant threatened A.N. and cut her with a knife.[2] The department opened a second investigation at this point. Although the victim had not yet disclosed the sexual abuse to anyone, the department was aware of "continuous domestic violence complaints . . . ."

In early March, 2012, while the investigation was ongoing and a few days before the defendant was to arrive back in the United States, the victim encouraged A.N. to report the defendant's physical abuse to the police, which she did. Although the police indicated that they were unable to help the family at that time,

the department immediately began to assist the family. Among other things, it moved the family to another town and helped A.N. secure an ex parte restraining order against the defendant.

In relevant part, the ex parte order (1) prohibited the defendant from contacting A.N. and her children, (2) granted A.N. custody of the children, (3) denied the defendant visitation rights, and (4) scheduled a hearing on the matter for March 15, 2012. Days later, the defendant returned from Guatemala and was served personally with the order. The court held a temporary restraining order hearing as scheduled, which the defendant attended with his counsel. As a result of the hearing, the court issued a temporary restraining order that, in relevant part, retained the same contact restrictions but granted the defendant "[w]eekly, supervised" visitation with the children. Defense counsel advised him of the order's terms in private, the judge and a victim advocate informed him of the terms in open court, and he received a physical copy of the order. The defendant, who primarily speaks Spanish, had the proceedings translated for him by either a court-appointed interpreter or by his bilingual attorney.[3]

After the order was in place, the defendant contacted the victim on at least three occasions. First, on March 28, 2012, he sent the victim a text message. The victim "felt unsafe" after receiving it and reported it to the police the same day. Second, at some point between April 1 and 9, 2012, the defendant sent the victim a letter. On April 9, 2012, the victim again went to the police, reported the letter and, for the first time, disclosed that the defendant had sexually abused her. Finally, on April 10, 2012, the defendant sent the victim another text message, which the victim reported to the police. Additional facts will be set forth as necessary.

The record also reflects the following procedural history. In addition to alleging the three counts of criminal violation of the restraining order, the state charged the defendant with three counts of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1) and three counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2). Following a trial, a jury found the defendant guilty of two counts of sexual assault in the second degree, two counts of risk of injury to a child, and all three counts of criminal violation of a restraining order. The jury found the defendant not guilty of one count of sexual assault in the second degree and one count of risk of injury to a child. The court denied the defendant's posttrial motions for a judgment of acquittal, to set aside the jury's verdict, and for a new trial. On the sexual assault and risk of injury counts, the defendant received a total effective sentence of forty years of imprisonment, execution suspended after twenty-five years, followed by twenty-five years of probation. On the restraining order

violation counts, the defendant received a sentence of five years imprisonment on each count, to run concurrently with the sexual assault and risk of injury sentences.

The defendant appealed to the Appellate Court, which affirmed the judgments of conviction. *State* v. *Elmer G.*, supra, 176 Conn. App. 383. He then petitioned this court for certification to appeal, which we granted, limited to the following issues: (1) "Did the Appellate Court properly conclude that there was sufficient evidence to support the defendant's conviction for criminal violation of a restraining order?" And (2) "[d]id the Appellate Court properly conclude that the defendant was not deprived of his right to a fair trial by prosecutorial impropriety?" *State* v. *Elmer G.*, 327 Conn. 971, 173 A.3d 952 (2017).[4]

I

The defendant first claims that the state presented insufficient evidence for a reasonable jury to have concluded that he contacted the victim in violation of the temporary restraining order against him. We disagree.

In reviewing a claim of insufficiency of the evidence, we construe the evidence in the light most favorable to sustaining the verdict. E.g., *State* v. *Moreno-Hernandez*, 317 Conn. 292, 298, 118 A.3d 26 (2015). We then determine whether the jury reasonably could have concluded that the evidence established the defendant's guilt beyond a reasonable doubt. Id. A defendant is guilty of a criminal violation of a restraining order if he (1) had a restraining order issued against him, (2) had "knowledge of the terms of the order," and (3) "contact[ed] a person in violation of the order . . . ." General Statutes § 53a-223b (a).

On appeal, the defendant does not dispute that he had a restraining order issued against him and that he contacted the victim twice by text message and once by letter. Rather, he argues that the state presented insufficient evidence that (1) he had "knowledge of the terms of the order" because the court's explanation of the order to him was unclear, and (2) because he does not read or understand English and the terms were not translated for him, and (3) the contact via letter with the victim was "in violation of the order" because it occurred before the order was in place.

We first set forth the terms of the order. The temporary restraining order the court entered against the defendant consisted of four standardized Judicial Branch forms stapled together. The first was a single page form titled "Order of Protection." That form required the issuing court to identify a "[p]rotected [p]erson" (A.N.) and a "[r]espondent" (the defendant), who were to be the subjects of the order's protections and prohibitions, respectively. It then listed several terms the defendant had to follow, two of which are

relevant to this appeal. The first term prohibited the defendant from contacting A.N. and certain people close to her: "Do not contact the protected person in any manner, including by written, electronic or telephone contact, and do not contact the protected person's home, workplace or others with whom the contact would be likely to cause annoyance or alarm to the protected person." The second term notified the defendant that he would find "[a]dditional terms" on a form titled "Additional Orders of Protection."

That single page form, "Additional Orders of Protection," contained a different list of terms, one of which extended A.N.'s protection to her children: "This order also protects the protected person's minor children." Below that appeared a section labeled "Temporary Child Custody and Visitation," in which the court permitted the defendant visitation as follows: "Weekly, supervised visits with children. The first three visits are to be supervised by Visitation Solutions, Inc., and thereafter by [the defendant's sister]."

Two other single page forms were also attached. On one, titled "Ex Parte Restraining Order/Restraining Order: Worksheet Only," the previously referenced terms—the contact restriction, the protection of A.N.'s children, and visitation—were reiterated. The other form, titled "General Restraining Order Notifications (Family)," contained basic information about the order, including that these documents constituted a restraining order, that violating the order was a criminal offense, that the recipient must comply with both the "Order of Protection" and "Additional Orders of Protection" forms, and that contacting a protected person could violate the order. The final form was a Spanish language translation of the notifications form.

From these forms, a reasonable jury could have found that the temporary restraining order limited the defendant's contact with his children to weekly, supervised visits and, thus, that by initiating unsupervised contact with the victim via text message and letter, the defendant "contact[ed] a person in violation of the order . . . ." General Statutes § 52-223b (a).[5] The "Order of Protection" form plainly provides: "Do not contact the protected person in *any* manner, including by written, electronic or telephone contact . . . ." (Emphasis added.) The minor children term made this contact restriction applicable to A.N.'s children: "This order also protects the protected person's minor children." Although this language does not expressly state that the defendant could not contact the children, a jury reasonably could infer it from the "Additional Orders of Protection" form. The language, "[t]his order *also* protects," indicates that the terms on the primary form "also" apply to the protected person's minor children. (Emphasis added.)

The no contact term itself also applies not only to

the protected person, but to "others with whom the contact would be likely to cause annoyance or alarm to the protected person." A reasonable jury therefore could find that unsupervised contact with the children "would be likely to . . . alarm" A.N. on the basis of the defendant's history of verbally and physically abusing family members, which included the events that directly precipitated the order: his threats to A.N. with a knife, which occurred in front of her children, and hitting A.N. when she would get between him and the children in an effort to protect them when he was hitting the children, after which she went to the police and was taken to a shelter by the department along with her children in an effort to keep the children away from the defendant.

### A

The defendant first argues that there was insufficient evidence from which the jury could conclude that he had "knowledge of the terms of the order"; General Statutes § 53-223b (a); because the court's explanation of the order at the temporary restraining order hearing "created an ambiguity" about its scope. We disagree. The court expressly instructed the defendant to limit "contact" with the children to weekly, supervised visits.

"A person acts 'knowingly' with respect to . . . a circumstance described by a statute defining an offense when he is aware . . . that such circumstance exists . . . ." General Statutes § 53a-3 (12). Knowledge is typically inferred. E.g., *State* v. *Simino*, 200 Conn. 113, 119, 509 A.2d 1039 (1986) ("[o]rdinarily, guilty knowledge can be established only through an inference from other proved facts and circumstances" [internal quotation marks omitted]).

The temporary restraining order hearing proceeded as follows. Defense counsel stated that he had reviewed the order with the defendant and his sister, and that the victim advocate had also been present to answer questions. Defense counsel also confirmed that he would "make [the defendant] understand" the proceedings. The victim advocate and the court then had the following discussion:

"The Victim Advocate: What we've agreed upon is that *it would be considered a no contact restraining order*.

"The Court: *As far as mom is concerned*?

"The Victim Advocate: *As far as mom is concerned*.

"The Court: Right.

"The Victim Advocate: *Contact with the kids* [*will*] *be limited to weekly, supervised visits*.

"The Court: *Contact with minor children weekly, supervised. Yes*?

"The Victim Advocate: To fully cooperate with all of [the department's] recommendations.

"The Court: Yes?

"The Victim Advocate: The first three visits will be through Visitation Solutions [Inc.]

"The Court: Okay.

"The Victim Advocate: The following visits will be through the sister . . . ." (Emphasis added.)

Thereafter, the court addressed the defendant directly: "I am going to order a temporary restraining order. *Now, as to* [*A.N.*] *and the five children*, sir, you are not to assault, threaten, abuse, harass, follow, interfere with or stalk. You are to stay away from the home of [A.N.] or wherever she's residing, and *you're not to contact her in any manner*. As far as the children are concerned, *you can have contact with your children but for now we need it supervised. It's to be weekly and supervised*. The first three visits you have with the children will take place at Visitation Solutions, Inc., and you will pay the fee. That's for the first three visits, starting next week. After that, your weekly visitation will be supervised by your sister . . . . Any contact that you need to have with your wife, or that your wife needs to have with you, will go through a third party . . . ." (Emphasis added.) We conclude that the court's explanation was not so unclear that the jury could not reasonably have determined that the defendant knew he was prohibited from contacting the children, outside of weekly, supervised visits.

The defendant relies primarily on the fact that the court specified that the no *assault* term applied to both A.N. and her minor children, but did not likewise specify that the no *contact* term applied to both A.N. and the children. We are not persuaded. Immediately after mentioning the no contact term as applied to A.N., the court specified to the defendant: "[Y]ou can have *contact* with your children but for now we need it supervised." (Emphasis added.) The court clarified that contact would be "weekly and supervised." Previously, in the presence of the defendant, the victim advocate similarly characterized the order, stating: "*Contact* with the kids [will] be limited to weekly, supervised visits." (Emphasis added.)

It is possible to infer that the court and the victim advocate each meant "visitation" when they said "contact," given the references to visitation that followed. If the jury drew this inference, then it would have concluded that neither actually mentioned a restriction on contact between the defendant and the children. Defense counsel made this argument to the jury: "I think what you'll see when you review this transcript is not much by the way of clear. And I say this because I think when you read it, it's going to be evident to you that, at best, what this was, was that the court and everybody talking about these things didn't really think about what to do with communication with the children

because all of the other children were so young, so they didn't contemplate it. . . . *What's supervised contact mean? They were referring to the supervised visitation*." (Emphasis added.) The jury rejected this argument, however. Certainly, it was entitled to infer that the court and the victim advocate each "[thought] about what to do with communication" and meant what they said—"contact" with the children was prohibited, with the exception of weekly, supervised visits. The written order, the actions of A.N. and the victim, and the ex parte order supported this conclusion. See footnote 5 of this opinion.

### B

The defendant also notes that he does not read or understand English and argues that the record does not show that he was informed, in his primary language, Spanish, that he was prohibited from contacting the children by text or letter. Therefore, he contends that he lacked "knowledge of the terms of the order . . . ." General Statutes § 53-223b (a). We disagree. On at least three occasions, the defendant heard Spanish language translations of the terms of the order. The jury also reasonably could have found that the letter he sent to the victim was evidence that he knew he was not permitted to contact the children outside of court-approved visits.

The defendant is a native of Guatemala and required a Spanish language interpreter at the restraining order hearing.[6] There was evidence, however, that he was fully apprised of the terms of the order in Spanish by his attorney, the court and the victim advocate.

First, defense counsel privately advised the defendant of the terms of the order. Counsel confirmed to the court that he was "fluent enough in Spanish that [he] could make [the defendant] understand what is said in English in this court . . . ." Defense counsel also stated that he had "looked at all the papers" and had "gone over that proposed [order] with [the defendant] . . . ." The defendant's sister had attended that meeting, and the victim advocate also had been present to answer questions.

The second and third instances of the defendant's receiving a Spanish language interpretation of the terms of the restraining order were through the on-the-record descriptions of the order by the court and the victim advocate. For a portion of the hearing, the defendant had the assistance of a Spanish language interpreter provided by the court. For the remainder of the hearing, including during the comments of the victim advocate and the court set forth previously, defense counsel served as the defendant's interpreter. Although defense counsel argued to the jury that "things get lost in translation" and that "we have no idea what was understood [by the defendant]," there was no evidence that the

translations were inaccurate or that the order entered by the court differed from the proposed order the defendant had reviewed with his attorney. Thus, the jury reasonably could have inferred that each of these three translations was an accurate description of the order.

Finally, the defendant asked the victim's sibling to deliver the letter to the victim, rather than delivering it himself. As the Appellate Court aptly reasoned, this "suggests that the defendant knew that he could not have contact with the victim outside of their weekly, supervised visits, which the victim was refusing to attend." *State* v. *Elmer G.*, supra, 176 Conn. App. 361.[7]

Therefore, we conclude that the state presented sufficient evidence that the defendant had "knowledge of the terms of the order" prohibiting him from having unsupervised contact with his children via text message or letter.[8] General Statutes § 53-223b (a).

C

Finally, regarding the third count of criminal violation of a restraining order, the defendant argues that the state presented insufficient evidence that he sent a letter to the victim while the order was in effect, and, thus, this instance of contact was not in violation of the order. We disagree. The victim testified that she received the letter at some point between April 1 and 9, 2012, while the order was in effect. There was also evidence that the defendant had given the letter to one of her siblings at one of the visits permitted under the order, which, of course, would have occurred while the order was in effect. Finally, the contents of the letter—the defendant's pleas to the victim to meet with him—suggest that it was written in response to the victim's refusal to attend the court-approved visits, which, again, would have occurred while the order was in effect.

II

The defendant next claims that the prosecutor committed several improprieties. Specifically, he argues that the prosecutor improperly (1) bolstered the credibility of two witnesses during questioning, (2) vouched for the victim during closing argument to the jury, and (3) attempted to evoke sympathy for the victim during closing argument.[9] We disagree with each of the defendant's arguments.

We apply a two step analysis for claims of prosecutorial impropriety. *State* v. *Warholic*, 278 Conn. 354, 361, 897 A.2d 569 (2006). First, we determine whether any impropriety occurred. Id. Second, we determine whether any impropriety deprived the defendant of his due process right to a fair trial, relying on the factors enumerated in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). *State* v. *Warholic*, supra, 361. It is the defendant's burden to show that the prosecutor's conduct was improper and that it constituted a denial of due process. *State* v. *Felix R.*, 319 Conn. 1, 9, 124

A.3d 871 (2015). If a prosecutor's remark is ambiguous, this court should not " 'lightly infer' " that it is improper. Id. Upon our review of the challenged remarks, we do not find any of them to be improper.

A

The defendant first argues that the prosecutor's questioning improperly bolstered the credibility of two witnesses. We disagree. This court has held that similar conduct by prosecutors is not improper. Moreover, the defendant alleges evidentiary violations and fails to identify any harm of a constitutional nature, upon which claims of prosecutorial impropriety rest. We therefore conclude that the prosecutor's conduct was not improper.

The defendant specifically challenges two lines of questioning between the prosecutor and the state's witnesses. The first line of questioning occurred at the end of the direct examination of the victim:

"[The Prosecutor]: [*A*]*re you making this stuff up*?

"The Victim: No.

"[The Prosecutor]: *Has anybody put you up to testifying the way that you have testified here today in court*?

"The Victim: No.

"[The Prosecutor]: In your own words, why are you doing it?

"The Victim: Because I wanted to get out of the life that I had with him." (Emphasis added.)

The second line of questioning occurred on redirect examination of Lourdes Lopez, a pastor at the victim's church, to whom the victim had disclosed the defendant's sexual abuse. On direct examination, Lopez had testified that she had observed the victim crying and, on that basis, decided to talk to her about her home life, which ultimately led to the victim's disclosure. On cross-examination, defense counsel questioned Lopez' motives for approaching the victim—whether it was her own idea to talk to the victim or whether she had been convinced to do so by Altagracia Lara, a social worker who was helping the family. Lopez conceded that Lara had asked her to ask the victim about whether "anything was happening" with the defendant.[10] On redirect examination, the prosecutor attempted to rehabilitate Lopez during the following colloquy:

"[The Prosecutor]: You were asked a series of questions about a conversation you had with Altagracia Lara. Do you recall those?

"[Lopez]: It was just a phone call.

"[The Prosecutor]: And Alta [Lara] asked you to do something, didn't she?

"[Lopez]: She only said to me that, since I was closer to [the victim], probably, I should ask her about what was going on with her and her dad.

"[The Prosecutor]: So, when you asked [the victim] about what was happening, in your mind, when you asked that question, you had planned to ask that question. Correct?

"[Lopez]: Yes.

"[The Prosecutor]: And you said earlier you chose that moment because you felt she was weak?

"[Lopez]: Yes.

"[The Prosecutor]: In addition to Altagracia [Lara] telling you to ask that question, did you have any intention [of] asking that question yourself?

"[Lopez]: Yes.

"[The Prosecutor]: *Is that the truth*?

"[Lopez]: Yes. . . .

"[The Prosecutor]: Were you considering asking [the victim] even before Alta [Lara] called you?

"[Lopez]: Yes.

"[The Prosecutor]: And why was—why were you intending to do that?

"[Lopez]: Because of the way [the victim] was behaving." (Emphasis added.)

Under our evidence code, evidence bolstering a witness' credibility generally is inadmissible but may become admissible if the witness' credibility first has been attacked. See Conn. Code Evid. § 6-6 (a). Viewed in isolation, the prosecutor's questions, emphasized previously, which attempted to bolster the witnesses' credibility, might appear to violate this rule. However, defense counsel's cross-examination of the victim and Lopez at least arguably constituted attacks on their credibility. Because defense counsel did not object to any of the prosecutor's questions, we have no ruling from the trial court on whether defense counsel in fact had placed the witnesses' credibility at issue. Therefore, the issues the defendant raises are unpreserved. See, e.g., *State* v. *Edwards*, 99 Conn. App. 407, 412, 913 A.2d 1103, cert. denied, 281 Conn. 928, 918 A.2d 278 (2007). The defendant nonetheless seeks review of these questions under the rubric of prosecutorial impropriety, which implicates a constitutional right and is therefore subject to review despite the absence of an objection at trial. See, e.g., *State* v. *Angel T.*, 292 Conn. 262, 274–75, 973 A.2d 1207 (2009) (unpreserved claim of prosecutorial impropriety subject to review, although methodology of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 [1989], is inapplicable).[11] We conclude, however, that the prosecutor's conduct was not improper.

The defendant primarily relies on *State* v. *Singh*, 259 Conn. 693, 706, 793 A.2d 226 (2002). In that case, this court held that it was improper to ask a witness to comment on another witness' veracity. Id., 712. We offered two reasons for the conclusion. First, we stated that "determinations of credibility are for the jury, and not for witnesses." (Internal quotation marks omitted.) Id., 707. These questions lack probative value because whether another witness had lied is beyond the competence of the testifying witness. Id., 708. Second, we were concerned that these questions could confuse the jury: "[Q]uestions of this sort also create the risk that the jury may conclude that, in order to acquit the defendant, it must find that the witness has lied. . . . A witness' testimony, however, can be unconvincing or wholly or partially incorrect for a number of reasons without any deliberate misrepresentation being involved . . . such as misrecollection, failure of recollection or other innocent reason." (Citations omitted; internal quotation marks omitted.) Id. "This risk was especially acute" when a government agent testified because a government agent often is perceived to have " 'heightened credibility,' " and, thus, a jury might hesitate to find that the government agent lied. Id.

This court subsequently clarified that a question about the witness' *own* veracity was not necessarily improper. See *State* v. *Taft*, 306 Conn. 749, 764–65, 51 A.3d 988 (2012). In *Taft*, a witness gave an account of an event on direct examination but admitted on cross-examination that she previously had given a different account. Id. On redirect examination, the prosecutor asked the witness whether she was now lying. Id., 765. This question was not improper because "the prosecutor merely provided the jury with information relevant to determining why [the witness] may have changed her story and whether it should believe the version of events that she testified to at trial." Id. We distinguished *Singh* on the ground that "[s]uch testimony . . . did not improperly invade the province of the jury in determining whether [the witness] was credible. Indeed, exploring [the witness'] motivation for lying and her awareness of the ramifications of not telling the truth is exactly the type of information a jury requires to make an appropriate determination regarding a witness' credibility." Id.

As in *Taft*, both concerns identified by *Singh* are inapplicable to this case. First, information about the victim's and Lopez' *own* "motivation for lying . . . is exactly the type of information a jury requires" to assess their credibility. Id. Although the challenged question in *Taft* occurred on redirect examination, its reasoning applies equally to the prosecutor's questions on direct examination of the victim here because the questions went to her own credibility. Further, as we will describe more fully, defense counsel would go on to put the

victim's credibility squarely before the jury throughout the trial, including in his cross-examination of her.[12] E.g., *State* v. *Thomas*, Docket No. M2010-01394-CCA-R3CD, 2011 WL 5071917, *8 (Tenn. Crim. App. October 4, 2011) (not improper to ask "victim if she had been truthful" before defendant "cross-examined the victim extensively" on credibility).

Second, the prosecutor's questions were unlikely to confuse the issues for the jury. In no uncertain terms, defense counsel told the jury: "This didn't happen." His theory of the case was that the victim and Lopez were lying: "[The defendant] didn't do the things that he's being accused of. And it comes in the form of fabrication. Because at the end of the day, that's what this is." Defense counsel also offered a motive for them to lie: serious allegations against the defendant would secure financial aid from state agencies, give A.N. grounds for divorce, and give A.N. and the victim a basis for legal status in the United States. These issues also had been explored at length during examination of the witnesses. Moreover, the victim's graphic depictions of sexual, verbal, and physical abuse were especially unlikely to result from " 'misrecollection [or] failure of recollection,' " and neither witness was a government agent. *State* v. *Singh*, supra, 259 Conn. 708.

Our conclusion is further supported by consideration of the concerns underlying both a prosecutorial impropriety claim and the evidentiary rule prohibiting questions bolstering a witness' credibility before an attack on that witness' credibility. Due process and fundamental fairness underlie prosecutorial impropriety claims. See, e.g., *State* v. *Stevenson*, 269 Conn. 563, 571, 849 A.2d 626 (2004) ("[t]he touchstone of due process analysis in cases of alleged prosecutorial [impropriety] is the fairness of the trial" [internal quotation marks omitted]). The evidentiary rule underlying the defendant's claim, on the other hand, exists to promote judicial efficiency: "As of the time of the direct examination, it is uncertain whether the cross-examiner will attack the witness's credibility . . . . If the opposing counsel [does not attack the witness' credibility], all the time devoted to the bolstering evidence on direct examination will have been wasted." 1 C. McCormick, Evidence (7th Ed. 2013) § 33, pp. 204–205; see also Fed. R. Evid. 608, advisory committee notes ("enormous needless consumption of time which a contrary practice would entail justifies the limitation"). Because the evidentiary rule against preemptive bolstering of a witness' testimony has its roots in efficiency, rather than fairness, we will not in the present case rely on it as a basis on which to adjudicate a claim of prosecutorial impropriety. Cf. *State* v. *Ruffin*, 144 Conn. App. 387, 399, 71 A.3d 695 (2013) ("[r]obing garden variety claims [of an evidentiary nature] in the majestic garb of constitutional claims does not make such claims constitutional in nature" [internal quotation marks omitted]), aff'd, 316

Conn. 20, 110 A.3d 1225 (2015). Therefore, we conclude that the prosecutor's questions to the victim and Lopez about their truthfulness were not improper.

B

The defendant points to three comments the prosecutor made during closing argument and argues that each was an improper attempt to evoke sympathy for the victim. We disagree and address each comment in turn.

"[A] prosecutor may not advance an argument that is intended solely to appeal to the jurors' emotions and to evoke sympathy for the victim . . . ." *State* v. *Long*, 293 Conn. 31, 59, 975 A.2d 660 (2009). This kind of argument "invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." (Internal quotation marks omitted.) Id.

The prosecutor, in the first challenged comment, asked the jurors to consider their own perspectives: "[The victim was] asked . . . why are you saying these things about your father? And here's what she said: 'I had to get out of the life I had with him.' *If you were in her position, would you feel the same way*?" (Emphasis added.) The defendant argues that this was an improper "golden rule" argument.[13] We disagree.

"[A] golden rule argument is one that urges jurors to put themselves in a particular party's place . . . or into a particular party's shoes. . . . Such arguments are improper because they encourage the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." (Internal quotation marks omitted.) *State* v. *Long*, supra, 293 Conn. 53–54. But we have repeatedly recognized that "not every use of rhetorical language or device is improper." (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 366. Specific to golden rule arguments, we have acknowledged that the "animating principle behind the prohibition . . . is that jurors should be encouraged to decide cases on the basis of the facts as they find them, and reasonable inferences drawn from those facts, rather than by any incitement to act out of passion or sympathy for or against any party." *State* v. *Long*, supra, 57–58. In this light, a prosecutor may ask jurors to place themselves in the shoes of a victim, so long as he does so only as a rhetorical device "to encourage the jurors to draw inferences from the evidence . . . on the basis of . . . how a reasonable [person] would act under the circumstances." Id., 58; see also, e.g., *State* v. *Stephen J. R.*, 309 Conn. 586, 607, 72 A.3d 379 (2013) ("by having the jurors put themselves in [the victim's] place . . . the prosecutor was arguing that [the victim's] statements . . . were consistent with how a reasonable child her age would react under the specific circumstances");

*State* v. *Campbell*, 141 Conn. App. 55, 64–65, 60 A.3d 967 ("prosecutor used 'you' in a way that the jurors could distinguish as a request for them to view evidence as a reasonable person, and not as an appeal for them to empathize with the victim"), cert. denied, 308 Conn. 933, 64 A.3d 331 (2013).

Here, the challenged comment was directed at the victim's credibility, which, as discussed in part II A of this opinion, was squarely at issue. It was preceded by a litany of evidence that the victim was credible, including prior consistent statements and the various psychological, social and physical barriers she had to overcome in order to testify.[14] The prosecutor specified that the jury could infer that she was credible on the basis of this evidence and not on the basis of emotion: "And after all that, I am arguing to you that *this evidence shows* she's not fabricating these things." (Emphasis added.) He immediately followed the challenged statement by stating that the victim's conduct was consistent with how "a person" would react under these circumstances. See footnote 14 of this opinion. We conclude that the prosecutor's comment was a permissible attempt to encourage the jury, on the basis of how a reasonable person would view this evidence, to infer that the victim was not fabricating her testimony. The comment was not an improper attempt to encourage the jury to believe the victim out of passion or sympathy.

In the second challenged comment, the prosecutor referenced the victim's credibility, in light of the various psychological, social and physical barriers she faced in accusing the defendant of sexual assault: "[R]emember what the judge says about credibility. You [have] seen how a young woman who makes up a claim of sexual assault kind of has to come through and run the legal gauntlet. Even the members of her family can testify against her. But I think the evidence shows you that [the victim's] testimony has endured, it's remained intact in the core. . . . Remember what she's had to do. She's [gone] through counseling. She's [gone] through medical exams. She's [gone] through interviews. She's [gone] through court appearances. And she's gone through cross-examination. And after all that, I am arguing to you that this evidence shows she's not fabricating these things." These types of comments are permitted in Connecticut, and we decline the defendant's invitation to overrule this precedent. E.g., *State* v. *Felix R.*, supra, 319 Conn. 10 (not improper to "[recount] the difficulties that the victim faced during the investigation and trial"); *State* v. *Long*, supra, 293 Conn. 48 (not improper to ask jury "to infer that [the victim's] complaint was more credible because it required her to undergo an uncomfortable medical examination and embarrassing conversations with both her family members and complete strangers"); *State* v. *Warholic*, supra, 278 Conn. 377 (not improper to ask jury "to assess [the minor victim's] credibility by recognizing the emotional difficulty that

[he] subjected himself to by making the allegations of sexual assault").

The prosecutor, in the third challenged comment, asked the jury whether other individuals in circumstances similar to the victim would fabricate sexual assault accusations: "[I]f a young girl such as [the victim] wanted to fabricate a lie, is this the lie they would fabricate? I would submit to you that there is no young girl that wants to fabricate an untruth of this extent and this magnitude." The defendant argues that this comment invited the jury to rely on extraneous matters because it is "irrelevant whether most young girls would make up such allegations—the issue was whether [the victim] did." "[A] prosecutor should not inject extraneous issues into the case that divert the jury from its duty to decide the case on the evidence." (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 376. As stated previously, however, "not every use of rhetorical language or device is improper." (Internal quotation marks omitted.) Id., 366. Moreover, "the state may argue that a witness has no motive to lie"; id., 365; and may ask the jurors to draw inferences that are based on their "common sense and life experience." Id., 378. In this instance, the prosecutor's comment rebutted defense counsel's arguments that the victim fabricated her testimony. Although the prosecutor literally asked the jury how other young girls would respond in similar circumstances, which is irrelevant, he did so as a rhetorical device to encourage the jury to infer that the victim was not fabricating her testimony on the basis of how the jurors, in their life experience, would believe a reasonable person in similar circumstances would respond. Therefore, the prosecutor's comment was not improper.

C

Finally, the defendant highlights four comments the prosecutor made about the victim during closing argument to the jury and argues that each was an improper expression of the prosecutor's personal opinion about the victim's credibility as a witness. For the reasons stated by the Appellate Court, we disagree. See *State* v. *Elmer G.*, 176 Conn. App. 375–77.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Additionally, in accordance with the Violence Against Women and Department of Justice Reauthorization Act of 2005, § 106 (c), Pub. L. No. 109-162, 119 Stat. 2960, 2982 (2006), codified as amended at 18 U.S.C. § 2265 (d) (3) (2012), we decline to identify the party protected under a restraining order or others through whom that party's identity may be ascertained.

[1] General Statutes § 53a-223b (a) provides in relevant part: "A person is guilty of criminal violation of a restraining order when (1) (A) a restraining order has been issued against such person pursuant to section 46b-15 . . . and (2) such person, having knowledge of the terms of the order . . . (B)

contacts a person in violation of the order. . . ."

[2] A.N. acknowledged that her son had inaccurately reported that the defendant actually cut her with the knife. She described the incident as follows: "[Our son], the little kid, he didn't want to eat, so [the defendant] got upset and grab a knife. I got in the middle of it, and he was gonna kill me, so [the victim] got in the middle . . . ." The defendant injured the victim with a knife on a separate occasion, however, and held a knife to her neck on another occasion.

[3] The facts concerning the conduct at the temporary restraining order hearing derive from a transcript of the hearing admitted into evidence as exhibit 51 and submitted to the jury. Except for the referenced remarks, most of the transcript of that hearing—including any testimony the court heard in support of the order—was redacted, as agreed to by the parties, and therefore was not submitted to the jury.

[4] We declined to certify a question regarding whether there was sufficient evidence to support the defendant's conviction of sexual assault.

[5] The defendant's appellate counsel discussed at oral argument before this court an inconsistency, which was not discussed in the briefs, between the no contact term and the term granting visitation: the former prohibited "contact . . . in any manner" with the children, whereas the latter permitted "visits" with them. This arguably rendered the order ambiguous. Because this argument was raised for the first time at oral argument, however, we are not obligated to consider it. See, e.g., *Grimm* v. *Grimm*, 276 Conn. 377, 393, 886 A.2d 391 (2005), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006).

We emphasize that, although our courts generally examine an order of another court as a question of law subject to plenary review and construe it "in the same fashion as other written instruments"; (internal quotation marks omitted) *State* v. *Denya*, 294 Conn. 516, 529, 986 A.2d 260 (2010); the defendant has never before challenged the scope or clarity of the terms of the order as a matter of law (or, even, of fact). Rather, on appeal, he challenges only his *knowledge* of the order's terms as an insufficiency claim. Appellate counsel specified at oral argument that even the inconsistency of the written order only "goes to his knowledge." If the defendant had wanted to argue to this court, as a matter of law, that the order failed to adequately inform him that this kind of contact was prohibited, then we would agree with the well reasoned opinion of the concurring Appellate Court judge that he could have done so via a vagueness challenge. See *State* v. *Elmer G.*, supra, 176 Conn. App. 391 (*Prescott, J.*, concurring).

Similarly, at trial, the defendant evidently elected "to have the jury decide, as a factual question, whether he had knowledge of the terms of the orders." Id. He "never moved to dismiss the counts of the information on the ground that they were insufficient as a matter of law . . . ." Id. Nor did he even place the scope or clarity of the order squarely before the jury by "submit[ting] any particular request to charge that would seek . . . a jury determination regarding the question of whether the restraining orders were sufficiently clear and unambiguous." Id.

In any case, the defendant's argument fails as an insufficiency claim because the no contact and visitation terms are reconcilable under a reasonable reading of the order. In reviewing an insufficiency claim, we ask "whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Moreno-Hernandez*, supra, 317 Conn. 299. Each inference of fact supporting the verdict "need not be proved beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Taupier*, 330 Conn. 149, 187, 193 A.3d 1 (2018), cert. denied,     U.S.    , 139 S. Ct. 1188, 203 L. Ed. 2d 202 (2019). When the terms are read together, a reasonable view of them supports the jury's verdict of guilty because the visitation term was a limited modification of the contact restriction. In other words, the defendant was not to contact his children, except for weekly, supervised visits.

The inference that the defendant was not to contact the children outside of court-approved visitation is further supported by (1) the court's explanation of the order to the defendant ("you can have contact with your children but for now we need it supervised" and "[i]t's to be weekly and supervised"), (2) the victim advocate's characterization of the order to the court ("[c]ontact with the kids [will] be limited to weekly, supervised visits"), (3) the no contact term itself, which prohibits contact with anyone "likely to cause annoyance or alarm to" A.N. and, thus, also reasonably could be found to prohibit contact with the children, (4) the fact that A.N. and the victim interpreted the order to prohibit contact with the children (they immediately

reported contact to the police as violations of the order), and (5) the absence of this inconsistency in the ex parte restraining order, which did not grant visitation and therefore unequivocally restricted contact with the children.

We also note that an alternative reading of these terms, in which they are read to conflict, would render one of them meaningless. If the defendant can "visit" with the children but also has an absolute restriction on "contact" with them, exercising his right under the visitation provision would result in a violation of the no contact provision. Conversely, absolute respect for the no contact provision would make the visitation provision pointless. Although the order is not a model of clarity, reading these terms in harmony is not just *a* reasonable way to interpret the order, it is the *only* reasonable interpretation.

[6] At the defendant's criminal trial, the victim also testified that the defendant only "knew a little bit" of English.

[7] There was also evidence that the defendant received a physical copy of the order. A court clerk testified that it is the court's usual procedure to mail a temporary restraining order to a defendant after a hearing. Although we cannot say that the defendant's receipt of these orders would have itself been sufficient to establish his knowledge of the specific terms of the order, neither can we conclude that it was irrelevant to the jury's determination.

As noted in part I A of this opinion, one of the forms was printed in Spanish. It told the defendant that the documents he had received were a restraining order, a violation of the order was a criminal offense, and contacting a protected person might violate the order. The other forms also contained some material information that did not require translation, such as the names of his wife and children. Thus, it was entirely reasonable for the jury to infer that the defendant knew he was under some type of contact restriction with his wife and children on the basis of the forms alone.

For some courts, if a defendant receives a restraining order, he is deemed to have knowledge of its contents. E.g., *People* v. *Williams*, 118 App. Div. 3d 1295, 1296, 987 N.Y.S.2d 772 ("defendant's signature acknowledging receipt of the order of protection establishes that it was served and that [s]he was on notice as to its contents" [citations omitted; internal quotation marks omitted]), leave to appeal denied, 24 N.Y.3d 1090, 25 N.E.3d 354, 1 N.Y.S.3d 17 (2014); see *Smith* v. *State*, 999 N.E.2d 914, 917 (Ind. App. 2013) (rejecting defendant's argument that officer "had to inform him of every specific term" in protective order to establish knowledge of its terms); see also *Commonwealth* v. *Delaney*, 425 Mass. 587, 592, 682 N.E.2d 611 (1997) ("[c]learly, a showing that a defendant was served with a copy of a court order is strong evidence that a defendant had knowledge that certain conduct . . . could result in a criminal conviction"), cert. denied, 522 U.S. 1058, 118 S. Ct. 714, 139 L. Ed. 2d 655 (1998). In at least one jurisdiction, this presumption applies even if the order is written in English and English is not the defendant's primary language. See *Cardenas-Najarro* v. *Commonwealth*, Record No. 0699-13-4, 2014 WL 820544, *4 (Va. App. March 4, 2014) ("Once an order is served on a litigant, the litigant is deemed to have notice of the document . . . . [The] [a]ppellant cites no authority, and we find none to say, that the process server must explain the document to the recipient in order for him to have knowledge of the terms of the order. . . . If the litigant is properly served, it is incumbent upon the recipient to learn the import of the order." [Citations omitted.]).

We do not rely on the defendant's receipt of a physical copy of the order in this case, however, because of the other evidence that the defendant had knowledge of its terms. Cf. *State* v. *Wiggins*, 159 Conn. App. 598, 605 n.7, 124 A.3d 902 (2015) (declining to decide whether defendant had sufficient knowledge of protective order under General Statutes § 53a-223 based on presumed receipt of order), cert. denied, 327 Conn. 908, 170 A.3d 4 (2017).

[8] By affirming the defendant's conviction on these counts, we simply conclude that, given the record in this case and the defendant's arguments on appeal, we cannot say that no reasonable jury could have found the defendant guilty of the charges of violating the restraining order. Looking beyond the facts of this case, we understand that the Judicial Branch is committed to ensuring that persons who appear before our state's courts receive the tools necessary to understand the proceedings in which they participate and the orders issued therein, consistent with the Judicial Branch's mission to serve "the interests of justice and the public by resolving matters brought before it in a fair, timely, efficient and open manner." To facilitate "meaningful access to the court system and its programs and services," the Judicial Branch has committed to robust efforts to overcome language barriers that limited English proficient (LEP) litigants face when

appearing in court, which are implemented via the comprehensive Language Access Plan. See State of Connecticut, Judicial Branch, Language Access Plan (Rev. 2019) p. 2, available at https://jud.ct.gov/LEP/LanguageAccessPlan.pdf (last visited September 9, 2019). The Language Access Plan requires, for example, that the forms provided by the Judicial Branch and regularly used by the public in our court system are made available in the languages most often spoken by those who use them; see id., p. 9; and that interpreters and translation services are available "at no cost, for LEP parties and other LEP individuals, such as witnesses and victims, whose presence or participation is appropriate to the justice process." Id., p. 7. We urge all state judicial officers and Judicial Branch employees to continue to take pains to make certain that those appearing before our courts have been afforded the available interpreting and translation services necessary to enhance their understanding of matters involving them. And, even when any language barrier has been addressed, we emphasize that our trial courts must make certain that the orders they issue are clear, such as by making sure that restraining orders are specific about what forms of contact are being prohibited so there can be no misunderstanding. We can only expect confidence in our courts and respect for court orders that is commensurate with the efforts on the part of the entire Judicial Branch to ensure greater understanding and meaningful participation by those who come before us.

[9] The defendant also notes other comments made by the prosecutor and offers other grounds as to why they were improper. He did not, however, object to those comments at trial or raise them on appeal to the Appellate Court. Therefore, we do not consider them. See, e.g., *State* v. *Fauci*, 282 Conn. 23, 26 n.1, 917 A.2d 978 (2007).

[10] The following colloquy occurred between defense counsel and Lopez:

"[Defense Counsel]: And you said this was a decision on your own [to talk to the victim about her father]?

"[Lopez]: Oh, you're just trying to confuse me.

"[Defense Counsel]: Do you know a woman named Altagracia—Altagracia Lara?

"[Lopez]: Yes. When she called me just to—asking me that, that was a confirmation of what I already observed based on [the victim's] attitude. But that didn't have anything to do with the church. . . .

"[Defense Counsel]: It was Altagracia Lara who asked you to ask [the victim] . . . if anything was happening with her dad. Isn't that true?

"[Lopez]: Yes.

"[Defense Counsel]: And that is, in fact, why you asked [the victim] about whether anything was happening with her father. True?

"[Lopez]: Yes."

[11] The Appellate Court "decline[d] to review [the claim] under the prosecutorial impropriety framework." *State* v. *Elmer G.*, supra, 176 Conn. App. 371. Instead, it treated the claim as evidentiary and dismissed it as unpreserved. Id. We address the claim under the prosecutorial impropriety framework because we have addressed similar issues under that framework in the past. E.g., *State* v. *Maguire*, 310 Conn. 535, 562, 78 A.3d 828 (2013) ("because the state's case rested entirely on the victim's credibility, any improper remarks by the prosecutor that tended to bolster [the victim's] credibility, or to diminish that of the defendant, may very well have had a substantial impact on the verdict"); see also *State* v. *Taft*, 306 Conn. 749, 764, 51 A.3d 988 (2012); *State* v. *Singh*, 259 Conn. 693, 706, 793 A.2d 226 (2002).

[12] We also note that *Taft* relied on *State* v. *Vazquez*, 79 Conn. App. 219, 231 n.10, 830 A.2d 261, cert. denied, 266 Conn. 918, 833 A.2d 468 (2003), which involved questions on cross-examination. In that case, the Appellate Court stated: "We interpret the remarks in question as inquiries into their potential motivation for lying and their awareness of the ramifications of not telling the truth. We have long held that [a]n important function of cross-examination is the exposure of a witness' motivation in testifying. . . . We conclude that this is equally true of direct examination. Those questions, therefore, were not improper." (Citation omitted; internal quotation marks omitted.) Id.; see *State* v. *Taft*, supra, 306 Conn. 764.

[13] The Appellate Court addressed the prosecutor's comment but did so on different grounds without mentioning the defendant's "golden rule" argument. See *State* v. *Elmer G.*, supra, 176 Conn. App. 378–79 and 378 n.12; see also *State* v. *Long*, supra, 293 Conn. 53–54 ("[a] golden rule argument is one that urges jurors to put themselves in a particular party's place . . . or into a particular party's shoes" [internal quotation marks omitted]). Although we do not address several of the defendant's other arguments, which were not discussed by the Appellate Court; see footnote 5 of this

opinion; we address this one. Unlike the defendant's other arguments, which are raised for the first time on appeal to this court, the defendant raised this argument, albeit in passing, in his brief to the Appellate Court.

[14] In full, the prosecutor's argument was: "[The victim] told the story [to] Lourdes Lopez. She told it to her mom. She told it to the police. She told it to [a forensic pediatrician]. She told it to Julia Jiminez [the victim's school guidance counselor], and she told it to this jury. Remember what she's had to do. She's [gone] through counseling. She's [gone] through medical exams. She's [gone] through interviews. She's [gone] through court appearances. And she's gone through cross-examination. And after all that, I am arguing to you that this evidence shows she's not fabricating these things. Defense focused on all of the supposed reasons she's fabricating these claims except for one. There's one they left out. . . . [The victim was] asked . . . why are you saying these things about your father? And here's what she said: 'I had to get out of the life I had with him.' *If you were in her position, would you feel the same way*? This is exactly what a person would say that was in this position." (Emphasis added.)

———————————————